**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 11-3054 (Consolidated with 11-3055, 11-3056, 11-3057, 11-3058, 11-3059, 11-3061)**

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____

UNITED STATES OF AMERICA,
*Appellee*,

v.

ANDERSON STRAKER, ET AL.,
*Appellants*.
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CASE NO. 06-102
HON. JOHN D. BATES, DISTRICT JUDGE
_____

**REPLY BRIEF FOR APPELLANTS**
_____

Christopher S. Rhee
Leeann R. Morentz
Andrew M. Treaster
Victoria L. Killion
Andrew Macurdy
Jocelyn A. Wiesner
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC  20004
(202) 942-5000

*Counsel for Appellant Kevon Demerieux*

October 11, 2013

Paul Rosenzweig
501 C Street, NE
Washington, DC  20002
(202) 547-0660

*Counsel for Appellant*
*Christopher Sealey*


Charles B. Wayne
DLA PIPER LLP
500 Eighth Street, NW
Washington, DC  20004
(202) 799-4253

*Counsel for Appellant Wayne Pierre*


Pleasant S. Brodnax, III
1701 Pennsylvania Avenue, NW
Suite 300
Washington, DC  20006
(202) 462-1100

*Counsel for Appellant Kevin Nixon*


Jeffrey B. O'Toole
O'TOOLE ROTHWELL
1350 Connecticut Avenue, NW
Suite 200
Washington, DC  20036
(202) 775-1550

*Counsel for Appellant Zion Clarke*


Jonathan Zucker
1350 Connecticut Avenue, NW
Suite 202
Washington, DC  20036
(202) 624-0784

*Counsel for Appellant Ricardo De Four*


Steven R. Kiersh
5335 Wisconsin Avenue, NW
Suite 440
Washington, DC  20015
(202) 347-0200

*Counsel for Appellant Anderson Straker*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ........................................................................ i

GLOSSARY ................................................................................... xi

STATUTES AND REGULATIONS............................................... 1

SUMMARY OF ARGUMENT ....................................................... 1

ARGUMENT.................................................................................... 4

I.   ALTHOUGH DEFENDANTS PROFFERED EVIDENCE OF
     MR. MAHARAJ'S FRAUDULENTLY OBTAINED U.S.
     CITIZENSHIP, THE COURT ERRONEOUSLY BARRED
     DEFENDANTS FROM PRESENTING THIS EVIDENCE TO
     THE JURY TO CHALLENGE AN ESSENTIAL ELEMENT
     OF THE OFFENSE ..................................................................... 4

     A.   Standard of Review........................................................ 4

     B.   The District Court Violated Defendants' Due Process
          Rights When It Barred Them from Presenting a
          Complete Defense That Would Have Negated an
          Element of the Crime ..................................................... 5

          1.   Evidence of Mr. Maharaj's Citizenship Was Relevant ............. 9

          2.   Evidence of Citizenship Is a Factual Question for the
               Jury ......................................................................10

II.  THE DISTRICT COURT COMMITTED REVERSIBLE
     ERROR BY ADMITTING EVIDENCE OF THREE
     UNCHARGED HOSTAGE TAKINGS .....................................15

     A.   The Government Never Demonstrated a Need for the
          Other Crimes Evidence, and the District Court Never
          Made Such a Finding .....................................................16

     B.   There Was No Proper Purpose for Admitting Evidence of
          the Uncharged Offenses .................................................17

C.    The District Court's Error Prejudiced All Defendants.......................19

III.    THE CONFRONTATION CLAUSE REQUIRES FULL
REDACTION OF DEFENDANTS' STATEMENTS UNDER
*BRUTON V. UNITED STATES* ...................................................................21

    A.    Supreme Court Precedent Indicates that Wholesale and
Clumsy Neutral Pronoun Redactions Are
Unconstitutional...................................................................................23

    B.    This Circuit's Precedent Demands Full Redaction Here...................27

        1.    *Gray* Did Not Change the Analysis in the D.C. Circuit ..........28

        2.    Despite the Precautions Taken in the Court Below, There
Was Still an Inevitable Association with Individual
Defendants...............................................................................31

    C.    Full Redaction Is a Workable Solution..............................................35

    D.    The Error Was Not Harmless Beyond a Reasonable
Doubt...................................................................................................36

IV.    DEFENDANTS WERE DENIED A FAIR TRIAL DUE TO
THE PRESENTATION OF FALSE EVIDENCE AND THE
LATE DISCLOSURE OF MATERIAL EVIDENCE ...............................38

    A.    The Government Presented False Evidence in Violation
of *Napue v. Illinois*............................................................................38

        1.    Standard of Review................................................................38

        2.    The False Evidence ...............................................................41

    B.    The Government Failed to Disclose Material Evidence in
Time for Defendants to Use It Effectively.........................................43

        1.    Standard of Review................................................................44

        2.    Defendants Were Unable to Integrate the Mid-Trial
Disclosures into Their Defense Strategies..............................45

    C.    The False Evidence and Late Disclosures Had a Material
Impact on the Fairness of Defendants' Trial......................................54

V.      DEFENDANT SEALEY'S *MIRANDA* RIGHTS WERE
        VIOLATED ................................................................................................57

VI.     DEFENDANT SEALEY WAS PREJUDICED BY IMPROPER
        JOINDER ...................................................................................................60

VII.    THE DISTRICT COURT ABUSED ITS DISCRETION BY
        FAILING TO SEVER DEFENDANT STRAKER......................................62

CONCLUSION ...................................................................................................65

CERTIFICATE OF COMPLIANCE....................................................................67

# TABLE OF AUTHORITIES[*]

Page(s)

CASES

*Addington v. Texas*,
441 U.S. 418 (1979)......................................................................14

*Albright v. Oliver*,
510 U.S. 266 (1994)........................................................................6

*Arizona v. Youngblood*,
488 U.S. 51 (1988)........................................................................57

*Battaglino v. Marshall*,
172 F.2d 979 (2d Cir. 1949)....................................................10, 11

*Berger v. United States,*
295 U.S. 78 (1935)........................................................................57

*\*Brady v. Maryland*,
373 U.S. 83 (1963)........................................................................38

*\*Bruton v. United States*,
391 U.S. 123 (1968)......................................................................23

*Bullcoming v. New Mexico*,
131 S. Ct. 2705 (2011)..................................................................22

*Carella v. California*,
491 U.S. 263 (1989)........................................................................5

*Chapman v. California*,
386 U.S. 18 (1967)........................................................................36

*Crane v. Kentucky*,
476 U.S. 683 (1986)........................................................................5

---

[*] Authorities upon which we chiefly rely are marked with asterisks.

*Crawford v. Washington*,
    541 U.S. 36 (2004)..................................................................23

*Eley v. Erickson*,
    712 F.3d 837 (3d Cir. 2013) ..............................................30, 32

*Foxworth v. St. Amand*,
    570 F.3d 414 (1st Cir. 2009) ..............................................30, 33

*FW/PBS, Inc. v. City of Dallas*,
    493 U.S. 215 (1990)....................................................................4

*Giglio v. United States*,
    405 U.S. 150 (1972)..................................................................38

*Gillars v. United States*,
    182 F.2d 962 (D.C. Cir. 1950) ................................................11

*Gorbach v. Reno*,
    219 F.3d 1087 (9th Cir. 2000) (en banc) ..................................6

*\*Gray v. Maryland*,
    523 U.S. 185 (1998)............................................ 21, 23, 24, 29

*Holmes v. South Carolina*,
    547 U.S. 319 (2006)..................................................................48

*Huddleston v. United States*,
    485 U.S. 681 (1988)..................................................................18

*In re Sealed Case*,
    131 F.3d 208 (D.C. Cir. 1997) ..................................................4

*Keil v. Triveline*,
    661 F.3d 981 (8th Cir. 2011) ..............................................11, 14

*Koon v. United States*,
    518 U.S. 81 (1996), *superseded by statute on other grounds* ............................4

*Kotteakos v. United States*,
    328 U.S. 750 (1946)..................................................................20

*Kyles v. Whitley*,
 514 U.S. 419 (1995)..................................................................................38

*Leka v. Portuondo*,
 257 F.3d 89 (2d Cir. 2001).............................................45, 49, 51

*Missouri v. Seibert*,
 542 U.S. 600 (2004) (plurality opinion)........................................59

*\*Napue v. Illinois*,
 360 U.S. 264 (1959)..........................................................38, 39

*Nelson v. Adams USA, Inc.*,
 529 U.S. 460 (2000)..........................................................39, 40

*\*Richardson v. Marsh*,
 481 U.S. 200 (1987)...........................................22, 23, 27, 29

*Schneble v. Florida*,
 405 U.S. 427 (1972)..........................................................36, 37

*\*Serio v. United States*,
 401 F.2d 989 (D.C. Cir. 1968) (per curiam)........................21, 27

*Strickland v. Washington*,
 466 U.S. 668 (1984)..................................................................48

*Strickler v. Greene*,
 527 U.S. 263 (1999)..................................................................57

*United States v. (Ralph) Wilson*,
 160 F.3d 732 (D.C. Cir. 1998) .......................................27, 28

*United States v. Bowie*,
 232 F.3d 923 (D.C. Cir. 2000) ...............................................18

*United States v. Brown*,
 597 F.3d 399 (D.C. Cir. 2010) ...............................................18

*United States v. Celis*,
 608 F.3d 818 (D.C. Cir. 2010) (per curiam)..........................44

*United States v. Clark*,
   717 F.3d 790 (10th Cir. 2013)........................................................23

*United States v. Clarke*,
   767 F. Supp. 2d 12 (D.D.C. 2011) ("*Clarke IV*") ................................41, 45, 49

*United States v. Cook*,
   594 F.3d 883 (D.C. Cir. 2010) ........................................................4

*United States v. Daniels*,
   770 F.2d 1111 (D.C. Cir. 1985) ....................................................19

*United States v. Daum*,
   847 F. Supp. 2d 18 (D.D.C. 2012) ................................................45

*United States v. Delaema*,
   583 F. Supp. 2d 104 (D.D.C. 2008)................................................58

*United States v. Gaggi*,
   811 F.2d 47 (2d Cir. 1987).....................................................10, 12

*United States v. Gaines*,
   563 F.2d 1352 (9th Cir. 1977)........................................................63

*United States v. Gaudin*,
   515 U.S. 506 (1995)..................................................................5

*United States v. Gonzalez,*
   183 F.3d 1315 (11th Cir. 1999)......................................................34

*United States v. Gonzalez*,
   311 F.3d 440 (1st Cir. 2002) ........................................................7

*United States v. Gonzalez-Lopez*,
   548 U.S. 140 (2006)..................................................................22

*United States v. Herrera-Ochoa*,
   245 F.3d 495 (5th Cir. 2001) ........................................................6

*United States v. Hoover*,
   246 F.3d 1054 (7th Cir. 2001)......................................................30

*United States v. Iverson*,
    637 F.2d 799 (D.C. Cir. 1980) ...................................................39, 41

*United States v. Jass*,
    569 F.3d 47 (2d Cir. 2009)........................................................36

*United States v. Lujan*,
    529 F. Supp. 2d 1315 (D.N.M. 2007).........................................25

*United States v. Mathison*,
    909 F. Supp. 2d 1060 (N.D. Iowa 2012) ....................................33

*United States v. Meza-Soria*,
    935 F.2d 166 (9th Cir. 1991).................................................5, 14

*United States v. Moore*,
    651 F.3d 30 (D.C. Cir. 2011) (per curiam) .................. 18, 36, 60, 62

*United States v. Nash*,
    482 F.3d 1209 (10th Cir. 2007).................................................33

*United States v. Novo Sampol*,
    636 F.2d 621 (D.C. Cir. 1980) (per curiam) .............................62, 63

*United States v. Oruche*,
    484 F.3d 590 (D.C. Cir. 2007) ..................................................44

*United States v. Paxson*,
    861 F.2d 730 (D.C. Cir. 1988) ..................................................44

*United States v. Payne*,
    923 F.2d 595 (8th Cir. 1991)....................................................34

*United States v. Rashad*,
    396 F.3d 398 (D.C. Cir. 2005) ..................................................39

*United States v. Richards*,
    241 F.3d 335 (3d Cir. 2001)......................................................33

*United States v. Sheehan*,
    512 F.3d 621 (D.C. Cir. 2008) ...................................................5

*United States v. Shelton*,
   628 F.2d 54 (D.C. Cir. 1980) ..........................................................................20

*United States v. Smith-Baltiher*,
   424 F.3d 913 (9th Cir. 2005).............................................................5, 8, 9, 11

*United States v. Straker*,
   567 F. Supp. 2d 174 (D.D.C. 2008).........................................................18, 51

*United States v. Straker*,
   596 F. Supp. 2d 80 (D.D.C. 2009) ..........................................................57, 58

*United States v. Tinoco*,
   304 F.3d 1088 (11th Cir. 2002) .....................................................................14

*United States v. Wallach*,
   935 F.2d 445 (2d Cir. 1991) ..........................................................................43

*United States v. Washington*,
   294 F. Supp. 2d 246 (D. Conn. 2003)........................................................51, 52

*United States v. Washington*,
   952 F.2d 1402 (D.C. Cir. 1991) ....................................................................27

*United States v. West*,
   790 F. Supp. 2d 687 (N.D. Ill 2011).........................................................30, 34

*United States v. Williams*,
   429 F.3d 767 (8th Cir. 2005)..........................................................................25

*United States v. Zepeda*,
   705 F.3d 1052 (9th Cir. 2013)..................................................................12, 13

*Vazquez v. Wilson*,
   550 F.3d 270 (3d Cir. 2008) ..........................................................................33

*Washington v. Sec'y Pa. Dep't of Corr.*,
   726 F.3d 471 (3d Cir. 2013)..............................................................23, 29, 31

*Zafiro v. United States*,
   506 U.S. 534 (1993)......................................................................................52

**STATUTES**

*8 U.S.C. § 1451 ............................................................................ 7, 10

18 U.S.C. § 1961(4) .......................................................................... 20

18 U.S.C. § 3742(e) ........................................................................... 5

**RULES**

Fed. R. Evid. 401 ............................................................................... 9

*Fed. R. Evid. 404(b) ........................................................................ 15

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. V ......................................................................... 5

U.S. Const. amend. VI ........................................................................ 5

# GLOSSARY

| | |
|---|---|
| *Clarke IV* | March 2, 2011 Opinion Denying Defendants' Motions for Judgment of Acquittal, Motions for a New Trial, and Motions for Dismissal |
| Cooperators | Winston Gittens, Russel Joseph, Leon Nurse, and Jason Percival |
| Trinidad | Trinidad and Tobago |
| TTDF | Trinidad and Tobago Defense Force |
| TTPS | Trinidad and Tobago Police Service |

## STATUTES AND REGULATIONS

All pertinent statutes and regulations are contained in the Brief for

Appellants except 18 U.S.C. § 1961(4), which is reproduced in this brief's

statutory addendum.

## SUMMARY OF ARGUMENT[2]

In 2009 Defendants[3]—all citizens of Trinidad and Tobago ("Trinidad")—

stood trial for conspiracy and hostage taking resulting in death premised on events

that occurred in Trinidad in 2005.  The *only* nexus to the United States was the

Government's allegation that the victim Balram Maharaj was a U.S. citizen, based

on his possession of a U.S. passport and a certificate of naturalization.  Before trial,

Defendants proffered (1) substantial evidence that Mr. Maharaj procured his

naturalized citizenship by fraud and (2) authority that citizenship attained in this

manner is void ab initio—meaning from the outset.  Nevertheless, the district court

erroneously prohibited Defendants from presenting this evidence to the jury,

concluding that an 8 U.S.C. § 1451 denaturalization proceeding was the sole

---

[2] Defendant-Appellants joined certain arguments as set forth in the Brief for
Appellants and carry forward that division in this brief.  Further, in this brief,
Defendant-Appellants have focused on those issues meriting extended response.
The issues not addressed in this brief are adequately addressed in the Brief for
Appellants.

[3] Defendant-Appellants are Zion Clarke, Ricardo De Four, Kevon Demerieux,
Anderson Straker, Wayne Pierre, Christopher Sealey, and Kevin Nixon.

avenue to challenge Mr. Maharaj's citizenship.[4]  The Government's brief belies Defendants' aim of ensuring that the Government prove every element of the offense beyond a reasonable doubt.  The district court abdicated this responsibility, rejected Defendants' attempts to present a full and vigorous defense, and provided the Government with a shortcut to proving Mr. Maharaj's citizenship, thereby violating Defendants' Fifth and Sixth Amendment rights.

The district court's decision regarding citizenship is not the only appealable issue that compromised the fairness of Defendants' trial.  The Government presented to the jury extensive evidence of other uncharged hostage takings in Trinidad, which the district court incorrectly admitted pursuant to Federal Rule of Evidence 404(b).  This evidence was highly prejudicial, and any reasonable juror would be inappropriately swayed by its presentation.

Moreover, by allowing neutral pronoun redaction of ten statements from various Defendants, which remained incriminatory to non-declarant Codefendants, the district court violated Defendants' Confrontation Clause rights.  The neutral pronoun redactions were so numerous and inarticulate that the jury immediately knew the statements had been altered and that non-declarant Codefendants' names had been removed.  Given the Government's theory of the case and the evidence

---

[4] Defendants have filed a related civil appeal with this Court.  *Clarke v. Holder*, Case No. 11-5124.

introduced, the redactions undoubtedly created inevitable associations with particular non-declarant Codefendants.

Further, the Government presented false and misleading evidence at trial and repeatedly shirked its constitutional obligation to disclose material, favorable evidence in time for Defendants to use it effectively.  The Government has failed to address the cumulative impact of these violations.

The district court incorrectly ruled that Sealey's *Miranda* rights were not violated.  Contrary to the Government's position, the FBI was operating a joint venture investigation with the Trinidadian investigators, and therefore Sealey had a right to receive *Miranda* warnings before interrogation.  Finally, Sealey and Straker were both prejudiced by improper joinder and failure to sever given the disparities in evidence.

**ARGUMENT**

**I.      ALTHOUGH DEFENDANTS PROFFERED EVIDENCE OF MR. MAHARAJ'S FRAUDULENTLY OBTAINED U.S. CITIZENSHIP, THE COURT ERRONEOUSLY BARRED DEFENDANTS FROM PRESENTING THIS EVIDENCE TO THE JURY TO CHALLENGE AN ESSENTIAL ELEMENT OF THE OFFENSE[5]**

The district court committed reversible error by barring Defendants from admitting relevant evidence challenging an essential element of the offense, thus denying Defendants their constitutional rights to present a complete and meaningful defense.

**A.      Standard of Review**

The district court's ruling that Defendants, as a matter of law, could not present evidence regarding Mr. Maharaj's fraudulently obtained citizenship is reviewed de novo. *See United States v. Cook*, 594 F.3d 883, 886 (D.C. Cir. 2010). The Government attempts to reduce this matter to a simple evidentiary ruling, and thus argues that it should be reviewed for an abuse of discretion. Gov't Br. 34. However, because the district court's evidentiary ruling turned on an incorrect legal ruling it was, by definition, an abuse of discretion. *Koon v. United States*,

---

[5] Defendants maintain that the federal courts, as courts of limited jurisdiction, have an "independent obligation to examine [their] own jurisdiction." *In re Sealed Case*, 131 F.3d 208, 210 (D.C. Cir. 1997) (quoting *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990)). Because Mr. Maharaj's citizenship was void ab initio, and the charges were premised on the assertion that he was an American citizen, the district court did not have subject matter jurisdiction.

518 U.S. 81, 100 (1996) ("A district court by definition abuses its discretion when it makes an error of law."), *superseded by statute on other grounds*, 18 U.S.C. § 3742(e).  Therefore, the appropriate standard of review for this Court is de novo.

> **B.      The District Court Violated Defendants' Due Process Rights When It Barred Them from Presenting a Complete Defense That Would Have Negated an Element of the Crime**

That the Government must prove every element of a crime beyond a reasonable doubt is indisputable.  *United States v. Gaudin*, 515 U.S. 506, 509-10 (1995).  Likewise, the right to present a complete defense—firmly rooted in the Due Process Clause of the Fifth Amendment and the Compulsory Process and Confrontation Clauses of the Sixth Amendment—cannot be ignored.  U.S. Const. amends. V, VI; *see also Crane v. Kentucky*, 476 U.S. 683, 690 (1986); *United States v. Sheehan*, 512 F.3d 621, 631 (D.C. Cir. 2008).  Thus "barring a defendant from . . . challenging an element of the crime[] is structural error" and violates due process.  *United States v. Smith-Baltiher*, 424 F.3d 913, 922 (9th Cir. 2005).

Moreover, it is undisputed that citizenship was an element of the offense in this case, Gov't Br. 42, and thus the Government was required to prove, beyond a reasonable doubt, that Mr. Maharaj was a U.S. citizen.  *United States v. Meza-Soria*, 935 F.2d 166, 169 (9th Cir. 1991) (citing *Carella v. California*, 491 U.S. 263, 265 (1989)).  Simply put, Defendants had a right to challenge Mr. Maharaj's citizenship, and the district court erred when it refused to admit relevant evidence

that called into question this pivotal element of the offense.  Courts have not hesitated to overturn convictions when the Government failed to prove an element of the crime beyond a reasonable doubt.  *See, e.g.*, *United States v. Herrera-Ochoa*, 245 F.3d 495 (5th Cir. 2001) (finding that district court erred when it convicted the defendant because the government had failed to put forward sufficient evidence to prove an element of the crime beyond a reasonable doubt).

The Government relies heavily on *Gorbach v. Reno*, 219 F.3d 1087 (9th Cir. 2000) (en banc), for the proposition that citizenship must be safeguarded and thus cannot be challenged in a criminal proceeding.  Gov't Br. 38 n.17.  But due process must be no less safeguarded.  *Gorbach* does not, as the Government insinuates, purport to elevate the privilege of citizenship over the constitutional rights of a defendant facing criminal charges.  "This notion [that the government must prove the elements of a criminal case beyond a reasonable doubt]—basic in our law and rightly one of the boasts of a free society—is a requirement and a safeguard of due process of law in the historic, procedural content of 'due process.'"  *Albright v. Oliver*, 510 U.S. 266, 273 n.6 (1994) (internal quotation marks omitted and alterations in original).

The district court concluded incorrectly that a § 1451 denaturalization proceeding was the only way to address Mr. Maharaj's fraudulently procured citizenship.  As the Government itself acknowledges, "assuming the court had

'subject matter jurisdiction,'" it had the "authority to decide all other issues presented within the framework of the case." Gov't Br. 35 (citing *United States v. Gonzalez*, 311 F.3d 440, 442 (1st Cir. 2002)). This would include the status of Mr. Maharaj's citizenship. Accordingly, if the district court had subject matter jurisdiction, then it had the authority to admit and consider evidence challenging Mr. Maharaj's citizenship. What is more, § 1451 expressly contemplates that the judiciary could have a role in revocation proceedings. It is the *judiciary* that revokes and "declare[s] the certificate of naturalization . . . canceled" when a person is convicted of fraudulently procuring naturalization. § 1451(e); Gov't Br. 41 n.20.

Further, the Government fundamentally misunderstands what Defendants sought to do before the district court—namely, to present a complete defense and force the Government to prove every element of the case, as is required by the Constitution. The Government relies on the notion that a certificate of naturalization cannot be collaterally attacked outside of a § 1451 proceeding to support its argument that evidence of fraud in the procurement is not relevant. *See* Gov't Br. 36-40. In doing so, the Government emphasizes that the district court could not denaturalize Mr. Maharaj outside of a § 1451 proceeding. Gov't Br. 39. The Government contends that because the jury did not have the authority to

denaturalize Mr. Maharaj, the jury likewise was not entitled to hear evidence that his citizenship was fraudulently procured.

But Defendants were not asking to denaturalize Mr. Maharaj. Both the district court and the Government conflate the § 1451 denaturalization proceeding with appropriately presenting evidence to put on a meaningful defense. Because Mr. Maharaj's citizenship is an element of the offense, the jury must be permitted to find that the Government failed to prove his citizenship beyond a reasonable doubt. Defendants sought only to present a complete defense to the jury, including evidence that Mr. Maharaj's citizenship was obtained fraudulently and should be considered void ab initio by the jury for the purposes of the Defendants' criminal trial.

Such a finding by the jury would not have impinged on the exclusive nature of § 1451 proceedings. As the Ninth Circuit has reasoned, the jury's findings in a criminal proceeding would mean only that the Government had failed to prove an element of the offense beyond a reasonable doubt, and would not serve to revoke Mr. Maharaj's citizenship. *Smith-Baltiher*, 424 F.3d at 922. In *Smith-Baltiher*, the court recognized that a jury's findings in a criminal setting would have no impact on a citizenship determination, dismissing

> [t]he government's fear that juries will dole out United States passports to sympathetic defendants [as] without basis. Had [the defendant] been permitted to present evidence of his U.S. citizenship that the jury found credible, the determination in his favor would not

8

> have had the effect of awarding him citizenship. The jury's finding would have determined *only* that the government had not proven beyond a reasonable doubt that Smith was an alien.

*Id.* (emphasis added). Likewise, a jury's determination that the Government had failed to prove that Mr. Maharaj was a citizen "would have determined only that the government had not proven [an element of the crime] beyond a reasonable doubt." *Id.* The Government's arguments perpetuate a fundamental misunderstanding from the district court regarding the consequences of allowing Defendants to introduce relevant evidence challenging an element of the offense.

### 1. Evidence of Mr. Maharaj's Citizenship Was Relevant

It is undisputed that citizenship is an element of the offense.[6] The district court acknowledged this when it instructed the jury to determine whether Mr. Maharaj was a citizen. *See* JA 1937-45 (instructing the jury that it *may* find that Mr. Maharaj is a U.S. citizen). Defendants were prepared to present ample evidence that Mr. Maharaj fraudulently procured his citizenship. *See* Defs. Br. 12-14. Because citizenship procured through fraud is void ab initio, evidence of Mr. Maharaj's fraud was relevant because it would have tended to disprove the element of citizenship. *See* Fed. R. Evid. 401 (evidence is relevant if "it has *any tendency* to make a fact" that is of consequence to the action "more or less probable")

---

[6] "The government still had to prove beyond a reasonable doubt that, at the time of his death, Mr. Maharaj was a 'United States national.'" Gov't Br. 42.

(emphasis added); *see, e.g.*, *Battaglino v. Marshall*, 172 F.2d 979, 981 (2d Cir. 1949); 8 U.S.C. § 1451(a) (citizenship procured through fraud is void from the date it was granted).

The Government clings to the mistaken assertion that a § 1451 proceeding is the sole way to challenge Mr. Maharaj's citizenship.  In so doing, the Government disregards the relevance of citizenship as an element of the offense for the jury to decide.  *See* Gov't Br. 44.  A § 1451 proceeding has no bearing on this relevancy determination.

Had Defendants in this case been allowed to present all of the evidence of the fraud in Mr. Maharaj's application for citizenship, the jury—if properly instructed as to the law—could have concluded that his citizenship was void ab initio in the Defendants' criminal trial, thereby causing reasonable doubt about an element of the offense.  Accordingly, the district court should have admitted the evidence of fraud in Mr. Maharaj's application for citizenship.

## 2.    Evidence of Citizenship Is a Factual Question for the Jury

Not only was evidence of the fraud in Mr. Maharaj's citizenship relevant, it was also a question of fact that should have been submitted to the jury.  In turn, because the Government had to prove the element of citizenship to the jury beyond a reasonable doubt, *United States v. Gaggi*, 811 F.2d 47, 58 (2d Cir. 1987),

10

Defendants should have been allowed to present evidence that would negate that same element. *Smith-Baltiher*, 424 F.3d at 922-23.

The Government peremptorily dismisses Defendants' due process rights by declaring that citizenship is a legal status and thus not a factual question for the jury. Gov't Br. 47. The Government conveniently downplays its own responsibilities, stating that it had only the burden of presenting a certificate of naturalization as proof of Mr. Maharaj's citizenship, and that Defendants could not challenge how that certificate was obtained. Gov't Br. 46. The Government misunderstands its burden of proof on two counts. First, as the *Gaggi* and *Smith-Baltiher* courts articulated, the Government must prove citizenship beyond a reasonable doubt. *See Battaglino*, 172 F.2d at 981 (citizenship procured through fraud is void from the date it was granted). And because Mr. Maharaj committed fraud when he applied for citizenship, a certificate of naturalization *cannot* satisfy that burden. Moreover, a certificate of naturalization and a passport cannot serve as conclusive evidence of citizenship because they are obtained through an administrative proceeding, which does *not* meet the burden of proof in a criminal trial—beyond a reasonable doubt. *Keil v. Triveline*, 661 F.3d 981, 987 (8th Cir. 2011) (recognizing the differences in standards of proof between criminal proceeding and administrative proceeding to obtain passport); *Gillars v. United*

11

*States*, 182 F.2d 962, 981 (D.C. Cir. 1950) (finding that passport cannot serve as conclusive proof of citizenship in criminal trial for treason).

The Government struggles to distinguish the *Smith-Baltiher* and *Gaggi* decisions. According to the Government, *Smith-Baltiher* does not help Defendants because that court "expressly distinguished derivative by-birth citizenship from citizenship upon issuance of a certificate of citizenship." Gov't Br. 48 n.24. This is disingenuous. The *Smith-Baltiher* court made its distinction only to note at what point in time the defendant became a citizen, not to suggest that its holding turned on the mechanism by which the defendant became a citizen. Similarly, the Government argues that *United States v. Gaggi* is inapplicable because the Government offered more evidence in this case than it did in *Gaggi*. But the *Gaggi* court makes clear that *in any case* the Government must prove citizenship to the jury beyond a reasonable doubt when it is an element of the offense. 811 F.2d 47, 58 (2d Cir. 1987).

Attempting to dispense of these relevant cases in a footnote, the Government instead relies on a Ninth Circuit case that turned on the defendant's status as a Native American. *United States v. Zepeda*, 705 F.3d 1052 (9th Cir. 2013).[7] There

---

[7] The Ninth Circuit decision in *Zepeda* was recently superseded. 2013 WL 5273093 (9th Cir. Sept. 19, 2013). However, much of the relevant analysis remains.

the court held that the Government must prove both that the defendant was a member of a Native American tribe and that the tribe is federally recognized.  The Government places considerable emphasis on the court's determination that a tribe's federal recognition contains a legal element, arguing that "just like the continuing 'legal designation' conferred upon an Indian Tribe . . . Mr. Maharaj's status as a United States citizen was a legal question."  Gov't Br. 46.

However, the Government fails to recognize an important distinction. Defendants are not challenging the legal concept that a properly obtained certificate of naturalization connotes citizenship, but rather contend that they should have been allowed to put forward evidence to the jury that Mr. Maharaj did not properly obtain his certificate.  In fact, contrary to the Government's assertions, the *Zepeda* court had no choice but to recognize that it could not remove the question of Native American status from the jury.  *Id.* at 1065 ("[w]e are not at liberty to displace the role of the jury").  Further, as there was no challenge to the tribe's designation as federally recognized, the court had no opportunity to opine on whether such a challenge would be a question of fact.  This is an important distinction because here citizenship may be void ab initio because of fraud.  There is no comparable concept or challenge that would have affected the tribe's designation in *Zepeda*.

13

In addition, the Government is wrong to contend that it would satisfy its burden merely by introducing an authentic certificate of naturalization. As a preliminary matter, no court has held that a passport or certificate of naturalization can be used as conclusive proof in a criminal prosecution. *See, e.g.*, *Keil*, 661 F.3d at 987. To do so would go against the basic notion that the Government must prove every element beyond a reasonable doubt. This is so because an administrative determination of citizenship is not made by a determination beyond a reasonable doubt. *See Meza-Soria*, 935 F.2d at 169 (explaining that the "difference in burdens of proof alone should demonstrate that it would be quite improper to establish" a legal status conclusively in a criminal proceeding through findings in a prior administrative proceeding); *United States v. Tinoco*, 304 F.3d 1088, 1107 (11th Cir. 2002) ("[T]he legislature [cannot] create any presumptions as to those elements that negate the defendant's presumption of innocence."); *Addington v. Texas*, 441 U.S. 418, 423 (1979) ("[T]he interests of the [criminal] defendant are of such magnitude that . . . they have been protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment."); *id.* at 425 (The difference in standards of proof "is more than an empty semantic exercise." (internal quotation marks omitted)).

Although the Government could certainly use a certificate of naturalization as a form of evidence to show Mr. Maharaj's citizenship, alone, a certificate of

naturalization cannot be considered proof beyond a reasonable doubt of an element of the offense, especially when Defendants stood at the ready to present contradictory evidence demonstrating fraud and casting serious doubt on the same element of the offense.

## II.   THE DISTRICT COURT COMMITTED REVERSIBLE ERROR BY ADMITTING EVIDENCE OF THREE UNCHARGED HOSTAGE TAKINGS

The following cannot be contested: (1) the Government admits in its brief that the trial judge himself was confused by the Government's disorganized presentation of Rule 404(b) evidence as was one of the prosecutors, Defs. Br. 36-37; (2) the evidence of each of three uncharged hostage takings was so inappropriately detailed and extensive that the judge repeatedly admonished the Government, Defs. Br. 38; and (3) the judge felt the need to instruct the jury on six different occasions about separating evidence of the uncharged hostage takings from the one for which Defendants were on trial, Gov't Br. 54.

Despite the Government's assertions that the district court "carefully balanced" the propensity evidence, Gov't Br. 61, the court erred in admitting this evidence under Federal Rule of Evidence 404(b).  The harm from this error was entirely foreseeable, having long been identified by the Supreme Court, the courts of this Circuit, and the other circuits as well.

## A.    The Government Never Demonstrated a Need for the Other Crimes Evidence, and the District Court Never Made Such a Finding

A critical component of the analysis applied to other crimes evidence is whether the Government has a need for such evidence.  The Supreme Court has long held that if other crimes evidence is to be used, a district court must be cognizant of the evidence's highly prejudicial nature and consider, among other things, whether "other means of proof" are available.  *See* Defs. Br. 48-49.  The Government failed to articulate a need for this Rule 404(b) evidence.

Although the Government did not *need* evidence of the three uncharged hostage takings, it *wanted* the evidence for obvious reasons: the Government wanted Sita Ragoonanan to testify about the horrors of her abduction and captivity even though she was unable to identify any of the perpetrators.  The Government wanted Timothy Semurath, a friend of victim Robin Ramadar, to testify about negotiating with the kidnappers even though Mr. Semurath could give no testimony that connected any Defendant to that crime.  And, despite the Government's assertion that it was "precluded . . . from soliciting prejudicial details about the physical condition of victim Ramadar upon his release," Gov't Br. 53, Mr. Semurath testified that Mr. Ramadar (1) was "very, very weak" when released and seemed as if "most of his life was gone"; and (2) needed to recuperate in the hospital for five or six days.  JA 3689.  Similarly, the Government wanted

16

the Trinidad and Tobago Police Service ("TTPS") officers to testify that Mr. Jagdeo appeared "dirty," "frightened," and "ill-treated" when he was released. JA 3654-55.

In this manner, the Government was able to place three additional victims before the jury, either in person or by proxy, even though Defendants were not charged with those crimes. Although this strategy is a common one for the Government, it was the district court's job to act as a vigilant gatekeeper and to apply the two-part test under Rules 404(b) and 403 to this proposed evidence. The court failed in its job for all of the reasons set forth in Defendants' opening brief, but the court's shortcoming at the threshold was primarily a failure to determine whether the Government had a need for this extremely prejudicial evidence. The Government did not, and the court committed reversible error.

## B. There Was No Proper Purpose for Admitting Evidence of the Uncharged Offenses

The thirty-five pages of the Government's brief devoted to the other crimes issue contain so many mischaracterizations of Defendants' arguments and misstatements of law that space limitations preclude a response to each and every one. The Government's lengthy footnotes in the other crimes section of its brief are particularly egregious in this manner and have a consistent theme: Defendants supposedly have a "basic misunderstanding of this Court's 404(b) case law," Gov't Br. 56 n.31; "misunderstand" this Court's rejection of a "general 'complete the

17

story' or 'explain the circumstances' exception to Rule 404(b)," Gov't Br. 59 n.32; and incorrectly rely on a number of this Court's decisions concerning the ineffectiveness of jury instructions because those decisions did not concern Rule 404(b) and are therefore "inapt," Gov't Br. 68 n.35.

In truth, it is the Government that misunderstands this Court's 404(b) case law.  The Government (1) ignores the fundamental principle that the prosecution must demonstrate a need for other crimes evidence, as discussed above; (2) seeks to justify the district court's rationale that the Rule 404(b) evidence was admissible to "complete the story of the crimes charged"[8] despite directly contrary decisions of this Court;[9] and (3) ignores this Court's ruling in *United States v. Brown*, 597 F.3d 399 (D.C. Cir. 2010), that evidence of uncharged crimes is permissible to prove intent only "when th[e] issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct." *Id*. at 404 (alteration in original) (quoting *Huddleston v. United States*, 485 U.S. 681, 685 (1988)) (internal quotation marks omitted).

---

[8]     *United States v. Straker*, 567 F. Supp. 2d 174, 178-79 (D.D.C. 2008) (citation and internal quotation marks omitted).

[9]     *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000); *United States v. Moore*, 651 F.3d 30 (D.C. Cir. 2011) (per curiam), *cert. granted in part*, 132 S. Ct. 2772 (2012) and *cert. denied*, 132 S. Ct. 2772 (2012) and *aff'd in part sub nom Smith v. United States*, 133 S. Ct. 714 (2013).

The Government must ignore or seek to distinguish the prior decisions of this Court because of one undisputed fact: the Government, by its own admission, did not need the uncharged crimes evidence to prove its case.  Under these circumstances, the evidence of the three uncharged hostage takings was propensity evidence, pure and simple.  And it tainted the entire trial, not only for the Defendants allegedly involved in the other kidnappings, but for the other Defendants as well.

### C.    The District Court's Error Prejudiced All Defendants

The Government asserts that Defendants Nixon, Demerieux, Sealey, and Straker "cannot claim prejudice" if the Rule 404(b) evidence was erroneously admitted because they did not participate in the three uncharged hostage takings. Gov't Br. 71.  This argument, however, is contrary to both common sense and the Government's own theory of the case.  First, as this Court has long recognized, it is extraordinarily difficult for a jury to compartmentalize other crimes evidence: "[O]nce evidence of prior crimes reaches the jury, it is most difficult, if not impossible, to assume continued integrity of the presumption of innocence.  A drop of ink cannot be removed from a glass of milk."  *United States v. Daniels*, 770 F.2d 1111, 1118 (D.C. Cir. 1985) (citation and internal quotation marks omitted).

Second, apart from the confusion created by the Government's presentation of the other crimes evidence, the Government's theory, as confirmed in its

appellate brief, was that all of the hostage takings were perpetrated by "a rotating pool of armed henchmen."  Gov't Br. 57.  The Government nonetheless argues that its allegations did not constitute, as Defendants had noted, a "new conspiracy" "not charged in the indictment," and, thus, a "variance."  Defendants raised this issue at trial.  *See* Defs. Br. 57-58 (citing JA 3021).  And "a rotating pool of henchmen" precisely fits the statutory definition of "association-in-fact" under the RICO statute.  *See* 18 U.S.C. § 1961(4); Gov't Br. 58.  Although the Government vigorously objects to Defendants' argument that, in effect, they were impermissibly tried under a RICO theory, Gov't Br. 67 n.34, the Government's language in its own appellate brief confirms the point.

Finally, if there is any question as to whether the jury attributed the other crimes evidence to Nixon, Demerieux, Sealey, and Straker, this Court must reverse their convictions unless it can say, "with fair assurance, . . . that the judgment (of the jury) was not substantially swayed by the error [of admitting other crimes evidence] . . . ."  *United States v. Shelton*, 628 F.2d 54, 57 (D.C. Cir. 1980) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).  The same is true for Clarke, Pierre, and De Four.

## III.   THE CONFRONTATION CLAUSE REQUIRES FULL REDACTION OF DEFENDANTS' STATEMENTS UNDER *BRUTON V. UNITED STATES*

The district court's neutral pronoun redaction is unconstitutional. Defendants' redacted statements fall within *Gray v. Maryland*, 523 U.S. 185, 192 (1998), because they are "obvious indications of alteration." Thus, the redactions are unconstitutional as a class. Even if this Court finds that the redactions are not obvious alterations, when considered with other factual information in this case, the redactions nonetheless create inevitable associations with particular Defendants and violate *Serio v. United States*, 401 F.2d 989, 990 (D.C. Cir. 1968) (per curiam).

The Government attempts to minimize the harm to Defendants by neutral pronoun redaction. The Government ignores that (1) it is the Government's burden to prove its case and that burden should not be eased at the expense of Defendants' constitutional rights and (2) that the statements, as redacted in this case, were confusing. The Government's narrow viewpoint ignores the consequence of allowing this practice to proceed, and that everyone in the court room knew who "the other guy" or "other fella" was in most, if not all, of the redactions. Such ineffective redactions violate *Gray*, 523 U.S. 185, and *Serio*, 401 F.2d 989.

Not only does the Government fail to acknowledge how its position infringes Defendants' constitutional rights, but it also fails to address *Serio*, the

21

D.C. Circuit case most squarely on point.  Additionally, the Government ignores that full redaction is consistent with *Richardson v. Marsh*, 481 U.S. 200 (1987), which holds that redactions eliminating the existence of the non-declarant do not violate the Confrontation Clause.

This Court should reject the Government's argument for subjugating Defendants' Confrontation Clause rights in order to more conveniently secure convictions: "If a 'particular guarantee' of the Sixth Amendment is violated, no substitute procedure can cure the violation and '[n]o additional showing of prejudice is required to make the violation complete.'"  *Bullcoming v. New Mexico*, 131 S. Ct. 2705, 2716 (2011) (quoting *United States v. Gonzalez-Lopez*, 548 U.S. 140, 146 (2006)).  The Government's position—that it would make prosecutions marginally harder—has been "rehearsed and rejected" by the Supreme Court. *Bullcoming*, 131 S. Ct. at 2717.  "The constitutional requirement . . . 'may not [be] disregard[ed] . . . at our convenience,' and the predictions of dire consequences . . . are dubious."  *Id* at 2718 (citations omitted).

22

A.    **Supreme Court Precedent Indicates that Wholesale and Clumsy Neutral Pronoun Redactions Are Unconstitutional**[10]

The Government mischaracterizes Supreme Court precedent. The Government incorrectly argues that the Supreme Court has indicated "neutral pronouns would suffice." Gov't Br. 93 (citing *Gray*, 523 at 196). Contrary to the Government's argument, neither *Richardson* nor *Gray* holds that neutral pronoun redaction is constitutional. *See Richardson*, 481 U.S. at 211 n.5 (leaving open whether two situations fall within *Bruton*: (1) redactions with symbols or obvious indications of deletion; and (2) redactions with neutral pronouns); *Gray*, 523 U.S. at 192 (deciding "a question that *Richardson* left open, namely, whether redaction that replaces a defendant's name with an obvious indication of deletion, such as a blank space, the word 'deleted,' or a similar symbol, still falls within *Bruton*'s protective rule"); *see also Washington v. Sec'y Pa. Dep't of Corr.*, 726 F.3d 471, 476-77 (3d Cir. 2013) ("[T]he Supreme Court has expressed no opinion" regarding

---

[10] Defendants maintain that the divergent standards for analysis of testimonial and non-testimonial statements under the Confrontation Clause identified in *Crawford v. Washington*, 541 U.S. 36 (2004), should be carried forward to require a more exacting standard for redactions in testimonial statements under *Bruton v. United States*, 391 U.S. 123 (1968). Defendants argue there is substantial overlap and that the two cases should be read together to make neutral pronoun redaction, at least in testimonial statements, either very rare or unconstitutional altogether. *See United States v. Clark*, 717 F.3d 790, 815 (10th Cir. 2013) ("*Crawford* indicates that the class of testimonial statements that fall within the protective ambit of the Confrontation Clause *includes*, but is not limited to, statements covered also by *Bruton*.").

"the propriety of redactions that employ neutral pronouns and phrases."). In *Gray*, the Supreme Court addressed neutral pronoun redactions only to the extent those redactions fall into the category of "other obvious indications of alteration." *Gray*, 523 U.S. at 192.[11]

Even though *Richardson* is the only Supreme Court opinion to hold that certain statements are *admissible* under *Bruton*, the Government conveniently ignores it, arguing instead that *Gray* governs this issue. Gov't Br. 93. The Government's argument under *Gray*—that the neutral pronoun redactions blended into the statements such that the jury was not aware of the changes—is inaccurate. Gov't Br. 96-103. *Gray* makes clear that the use of wholesale neutral pronoun redactions that are clumsy, such that the redactions are thinly veiled identifiers, is unconstitutional. *See Gray*, 523 U.S. at 192 ("obvious indications of alteration" are unconstitutional under *Bruton*'s holding). Indeed, "*Bruton* is violated when the

---

[11] The Government argues that the Supreme Court's comment in *Gray* asking why "me, deleted, deleted, and a few other guys" could not be modified to "me and a few other guys" supports neutral pronoun redaction. Gov't Br. 93. That reference to dicta in *Gray* rings hollow. First, the Supreme Court is suggesting removal of the "deleted" references (the references to the codefendants), but to keep the reference to individuals not on trial, "a few other guys." In other words, the Supreme Court is suggesting that complete redaction of the existence of the codefendants, leaving only the reference to individuals not on trial, would have been acceptable. Second, because the reference to "a few other guys" refers to an indeterminate number, it is different in kind from the one-to-one comparisons in this case.

fact that a statement had been redacted is so obvious as to lead the jury through ordinary inferences directly to a defendant." *United States v. Williams*, 429 F.3d 767, 773 (8th Cir. 2005). And wholesale neutral pronoun redaction is ineffective at hiding the fact of redaction from the jury. *See id.* at 767 (finding that statement where defendant's name was redacted with neutral pronoun more than forty times meant that "in kind and degree, the redaction . . . made it obvious a name had been deleted" and that the neutral pronoun "may have lost its anonymity by sheer repetition"); *United States v. Lujan*, 529 F. Supp. 2d 1315, 1324-25 (D.N.M. 2007) (magnitude and length of statements distinguished this case from *Richardson* such that the "number of necessary redactions/replacements would make it so confusing as to which unnamed 'person,' 'individual,' or 'guy' did what that it becomes obvious that the names must have been redacted").

The Government's argument that the numerous actors and various "comings and goings" precluded a clear understanding of which Defendants were redacted, Gov't Br. 109, demonstrates a lack of understanding about how these redactions operate in practice. When there are such numerous redactions, a juror can "relatively easily infer that ambiguities in the roles of the persons involved must mean that . . . the names were redacted for purposes of trial." *Lujan*, 529 F. Supp. 2d at 1325. In this case the Government redacted Defendants' names at least sixty-six times in the ten introduced statements. Demerieux's name alone was redacted

thirty-one times with upwards of five redactions on a single transcript page. JA
3758-67, 3786-3809, 3812-25, 3831-3841, 4764-65. Likewise, Clarke's name was
redacted approximately thirty-five times. JA 4265-77; 4823-48. Numerous
redactions such as these invite juror associations and violate the Confrontation
Clause.

    In addition to the wholesale use of neutral pronouns, the redactions
themselves are inarticulate, are riddled with grammatical errors, and otherwise
indicate clear alterations. For instance, in Clarke's January 4, 2006 statement,
Demerieux's name is changed simply to "other guy" and not to a grammatically
correct alteration like "the other guy" or "some other guy." JA 3813-14. A few
pages earlier, Clarke refers to Demerieux as "second guy," which also calls
attention to the redaction. JA 3808. On that same page Clarke's statement refers
to him "and another guy guard[ing] Maharaj." JA 3808. Then, in Clarke's January
6 statement, Demerieux's name is redacted but the phrase, "[o]n the fifth night,
when Mr. Clarke and the other guy were guarding him" remains. JA 3834. A jury
could immediately connect these redactions to Demerieux.

    The Government incorrectly argues that designing the redactions "to mimic
the language idiosyncrasies of particular [A]ppellants," Gov't Br. 97, overcame
any Confrontation Clause violation. The effort to mimic language is laudable but
does very little to conceal the clear references to particular Defendants. The sheer

volume of redactions counters any attempt to mimic speech patterns enough that no discerning jury could be fooled.

Full redaction, which the Supreme Court has approved, *see Richardson*, 481 U.S. at 212, is the only appropriate and constitutional method for ensuring that Defendants' constitutional rights are protected. The Government rightfully points out that the Supreme Court did not mandate the practice of full redaction. Gov't Br. 94. Yet the nature of the redactions here could not have avoided prejudice.

### B.    This Circuit's Precedent Demands Full Redaction Here

In the D.C. Circuit, neutral pronoun redactions that create an "inevitable association" when considered with other evidence violate the Confrontation Clause. *Serio*, 401 F.2d at 990; *see also United States v. Washington*, 952 F.2d 1402, 1406-07 (D.C. Cir. 1991). Because there is no authority from the D.C. Circuit squarely addressing neutral pronoun redaction post-*Gray*, the "inevitable association" standard remains good law.[12] But the impact of *Gray*, if any, on neutral pronoun redaction is an open question in this Circuit. Instead of acknowledging *Serio* and *Washington*, the Government relies on cases from other circuits. Gov't Br. 93-95, 103-04. The lack of Supreme Court precedent on point

---

[12] The Government argues that *Gray* changed the "inevitable association" standard from *Serio* and *Washington*. For that proposition, the Government cites a single post-*Gray* D.C. Circuit case that does not address redaction of any sort. Gov't Br. 105 (citing *United States v. (Ralph) Wilson*, 160 F.3d 732, 740 n.5 (D.C. Cir. 1998)).

has allowed lower courts to use divergent rules drawn from *Richardson* and *Gray* on neutral pronoun redactions.  These out-of-circuit cases do not govern the result here.

### 1.  *Gray* Did Not Change the Analysis in the D.C. Circuit

The Government's assertion that courts should ignore information outside of a given statement, *see* Gov't Br. 103-14, misreads *Gray* and *Richardson* and completely ignores *Serio*.  The Government's argument that *Gray* somehow changed this inevitable association standard, Gov't Br. 105, is incorrect.  For this post-*Gray* argument, the Government points only to *(Ralph) Wilson*, and in any event, *(Ralph) Wilson* considered a different question than the one at issue here. 160 F.3d at 739-41.  Additionally, in *(Ralph) Wilson*, the court noted that the "statements . . . set alone . . . [were] hardly incriminating."  160 F.3d at 739.  The statements did not specifically name the defendants as participants in the crime and became incriminating only when considered with other evidence.  *Id.*

In a footnote, the *(Ralph) Wilson* court notes that "the Court in *Gray* revisited *Bruton* and *Richardson* to clarify that statements that incriminate only inferentially are outside the scope of *Bruton*."  *Id.* at 740 n.5.  First, this statement is dicta in a footnote that merely reiterates the holding from *Richardson*. Moreover, the Supreme Court in *Gray* acknowledged that *Richardson*'s holding

must depend on "the *kind* of, not the simple *fact* of, inference." *Gray*, 523 U.S. at 196.

In *Richardson*, the redacted statement needed "evidentiary linkage" or a "contextual inference" to be considered incriminating. 481 U.S. at 209. Because the existence of the individual was redacted out of the statement in *Richardson*, the jury would have needed to make a three-step inference. The *Richardson* Court held that such linkage is so attenuated that it cannot be predicted in advance of trial and trying to prevent it is impractical—thus, it is certainly not an inevitable association. In contrast, *Gray* refers to only a two-step inference, the first inference being that another person existed, and the link being one other piece of information (either evidence or otherwise) leading to the clear inference of that person's identity. *Gray*, 523 U.S. at 196. As noted above, it is the "*kind* of, not the simple *fact* of, inference" that matters. *Id.* *Gray* did not change the neutral pronoun redaction analysis, as the Government contends. In the D.C. Circuit, the sort of inference that matters is one that creates an "inevitable association."

Contrary to the Government's insinuation, Gov't Br. 105 n.56, the D.C. Circuit is not the only circuit that considers information outside the four corners of the statement post-*Gray*. *See, e.g.*, *Sec'y Pa. Dep't of Corr.*, 726 F.3d at 477 (admonishing lower court for failing to consider the "kind of," not the mere "fact of," inference and rejecting a blanket rule "that any redaction that would require a

29

juror to consider an additional piece of information outside the confession in order to identify the coconspirator being referred to automatically falls inside the realm of *Richardson*" as an unreasonable view of the law); *United States v. Hoover*, 246 F.3d 1054, 1059 (7th Cir. 2001) ("To adopt a four-corners rule would be to undo *Bruton* in practical effect."); *Foxworth v. St. Amand*, 570 F.3d 414, 433 (1st Cir. 2009) (ruling that a redaction violated *Bruton* considering the statement's text, the context within which the statement was offered, and the number of events and actors implicated in the statement and on trial).

Courts have identified other factors that may be considered in determining whether an inevitable association exists, such as how many individuals sit at the defendants' table, the government's opening statement and theory of the case, and the charging documents. *See, e.g.*, *Eley v. Erickson*, 712 F.3d 837, 859 (3d Cir. 2013) (redactions did not satisfy *Bruton* when considered with number of individuals on trial, comments from prosecutor, government's theory of the case, and charging documents); *United States v. West*, 790 F. Supp. 2d 687 (N.D. Ill 2011) (holding that redactions that hide the names of defendants whose identities can be easily determined with only a cursory understanding of the case violates the Confrontation Clause). The ultimate question is not whether the statement has any inferential incriminatory value, but rather whether it leads to an inevitable association with a particular defendant.

30

Notably, one need not look at "all of the evidence" to find such linkage, but rather only at whether there was a clear inference from the "information . . . available to the trial court" at the time the statements were admitted.  *See Sec'y Pa. Dep't of Corr.*, 726 F.3d at 480 (noting that the statement from the *Gray* Court describing "the kind of inferences covered by *Bruton* as those that 'a jury ordinarily could make immediately, even were the confession the very first item introduced at trial' . . . is best understood in light of the sentences that immediately follow" addressing concerns with predictability, and that allowing consideration "of all the evidence would make it impossible for courts to know before a trial's conclusion which redactions would be acceptable").  "In sum, no reasonable reading of *Bruton*, *Richardson*, and *Gray* can tolerate a redaction that the trial judge knew at the time of introduction would be transparent to the jurors."  *Id.*  The redactions in this case are similarly obvious.

> **2.    Despite the Precautions Taken in the Court Below, There Was Still an Inevitable Association with Individual Defendants**

The redactions in this case were ineffective at curing the inevitable associations.  The redactions facially incriminate certain Defendants, are numerous and clumsy, correspond with the Government's theory of the case and with evidence known at the beginning of trial, generally maintain a one-to-one ratio, and fail to exclude the actions of redacted Defendants.

Even though the redactions eliminated any proper names, in many instances, the redactions left the reference. The Government's opening statement identified specific roles for Kevon Demerieux and Zion Clarke:

> Their job in connection with this kidnapping was to hold Mr. Maharaj hostage and guard him until they got word from the leader of this kidnapping, the main organizer, Wayne Pierre, that a ransom had been paid and they could release Mr. Maharaj.

> They marched Mr. Maharaj up into the jungle. They built a shelter out of sticks and leaves and put him in it, tied him to that post, bound him to the post, bound his wrists, bound his ankles, covered his mouth with duct tape, blindfolded him and kept him like that for days.

Defs. SA 021-22.[13] Thus, from the very beginning, any juror would recognize it as obvious that when Clarke referenced the second person walking up to the campsite and at the campsite with him, it could be no one other than Demerieux. JA 3800-06. The same is true of references to Clarke in Demerieux's statement. JA 4265-66; 4824-26. Although each Defendant in this case was charged with the same crime, the Government emphasized differing roles. For instance, Demerieux and Clarke were alleged to have been guards at the campsite. Courts have not hesitated to find *Bruton* violations where such roles are well-defined. *Eley*, 712 F.3d at 837 (neutral pronoun redaction referred to defendant's existence, referenced precise number of individuals in the courtroom, identified roles in the conspiracy, and

---

[13] "Defs. SA" refers to the Supplemental Appendix of Appellants, and "Gov't SA" refers to the Supplemental Appendix for Appellee.

coupled with comments by the prosecutor resulted in *Bruton* violation); *United States v. Nash*, 482 F.3d 1209, 1218 (10th Cir. 2007) (references to "driver" and "partner" violated *Bruton* when the statements were considered in context); *Vazquez v. Wilson*, 550 F.3d 270 (3d Cir. 2008) (neutral pronoun redactions identifying a shooter that plausibly could only be one of two people violated *Bruton* where only one of the two was on trial and the government argued that individual was the shooter); *United States v. Richards*, 241 F.3d 335, 341 (3d Cir. 2001) (redaction with use of "friend" violated *Bruton* when other evidence made it clear that non-declarant was the "friend"); *United States v. Mathison*, 909 F. Supp. 2d 1060 (N.D. Iowa 2012) (*Bruton* violation would occur if statement was redacted to omit name of individual when it would be clear from the face of the statement that it was referring to him as he was the only one charged with having possession of the gun to which the statement referred).

Further, and not seriously disputed in the Government's brief, the redactions, by and large, maintained a one-to-one relationship between the neutral pronouns and the implicated individuals. For instance, the redactions in this case to "fella," when referring to Demerieux going to the campsite or at the campsite, create a clear inference that Demerieux's name was redacted. *See, e.g.*, JA 3762. Courts regularly find that such redactions are unconstitutional. *See, e.g.*, *Foxworth*, 570 F.3d at 433 (considering the number of events and actors in the statement and on

trial in ruling that the redaction violated *Bruton*); *United States v. Gonzalez,* 183

F.3d 1315, 1321-22 (11th Cir. 1999) (concluding a Confrontation Clause violation

because prosecutor's presentation of redacted confession implicated precise

number (four) of confessor's codefendants), *superseded by regulation on other*

*grounds as stated in United States v. Diaz,* 248 F.3d 1065 (11th Cir. 2001); *United*

*States v. Payne*, 923 F.2d 595, 597 (8th Cir. 1991) (holding that confession

indicating plan to help "someone" escape from prison violated Confrontation

Clause because everyone at trial knew that "someone" meant defendant); *United*

*States v. West*, 790 F. Supp. 2d at 691 (rejecting redactions with one-to-one

comparisons).

The failure to redact the activities of non-declarants makes the inevitable

association even more likely.  For instance, Clarke's statements include at least

these references to Demerieux's actions: "other guy were guarding him," JA 3734;

"Clarke and a second guy walked," JA 3808; "another guy guarded," JA 3808;

"another guy arrived," JA 3806; "the other guy . . . would stay," JA 3806; "he and

other guy complied," JA 3813; and "the other guy told him," JA 3815.  The

Government's argument that such activities were redacted in some instances

underscores, first, that such redactions are perfectly feasible; and second, that this

practice is fraught with inconsistencies and is unacceptable.

34

Finally, the Government's reference to re-interviewing Demerieux after

Clarke's January 4, 2006 statement (JA 3825-26) cemented the "inevitable

association" that Clarke's statement included numerous incriminating references to

Demerieux.  The Government's argument that the Trinidadian authorities would

have sought to *arrest* Demerieux if Clarke implicated him is implausible.  Gov't

Br. 110-11.  Demerieux already had been arrested at that point.  As Agent Clauss

himself states, he "and [A]gent Cruz went with some Trinidad police officers to the

Malabar police post, to attempt to re-interview Mr. Demerieux, *who was being*

*held at that location.*"  JA 3825 (emphasis added).  This reference only expanded

the inevitable association connecting Demerieux as the other guard.

The cases from other jurisdictions cited by the Government are

distinguishable.  Gov't Br. 93-95, 101-02, 104.  The cases either include only a few

neutral pronoun redactions (rather than the wholesale redaction that took place in

this case), create no clear inference to whom the redactions referred, or were only

marginally incriminating.  In short, these out-of-circuit cases do not govern the

result here.

**C.     Full Redaction Is a Workable Solution**

The Government wrongly argues that full redaction would have eliminated

necessary evidence.  Gov't Br. 94-95.  The Government had *four* cooperating

witnesses from whom the so-called critical count-one evidence could have been

35

solicited.  One of the cases for its count-one point, *United States v. Jass*, 569 F.3d 47, 56 n.5 (2d Cir. 2009), is particularly distinguishable.  In *Jass*, there were only two individuals involved in the crime, so "complete redaction would have changed the substance of [the codefendant]'s confession because acknowledgement of a confederate was critical to proving that [the codefendant]'s admission was to conspiratorial" conduct.  *Id.*  In this case, establishing that Clarke and Demerieux agreed with each other to form the conspiracy is irrelevant if the Government can make a similar argument with regard to Clarke or Demerieux and one of the Cooperators.

### D.    The Error Was Not Harmless Beyond a Reasonable Doubt

This Court reviews a lower court's legal conclusions on a Confrontation Clause analysis de novo, and those findings are subject to a constitutional harmless error analysis.  *Moore*, 651 F.3d at 69.  To affirm a conviction, the Confrontation Clause error must be harmless beyond a reasonable doubt.  *Chapman v. California*, 386 U.S. 18, 24 (1967).  In particular, *Bruton* violations should be considered harmless only if a court can find beyond a reasonable doubt that "the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison."  *Schneble v. Florida*, 405 U.S. 427, 430 (1972).  Where the overall evidence is "even slightly ambiguous

or conflicting, or where the error at issue may otherwise have tipped the scales towards a guilty verdict," the error cannot be harmless. *Id*. at 1396.

Demerieux's statements indicate that he had no prior knowledge of the hostage taking plan and that he remained at the campsite only out of fear of reprisal. Aside from Clarke's statements, the Government did not introduce any evidence contradicting Demerieux's statements. Clarke's statements are the only evidence presented by the Government that Demerieux willingly agreed to stay at the campsite to guard Mr. Maharaj. Exclusion of those references to Demerieux in Clarke's statements would likely have had a significant effect on the jury's consideration of the evidence.

Further, at least one juror had questions about the instruction with respect to intent for conspiracy—in particular, (1) whether mere presence at the scene was sufficient for conspiracy, and (2) whether a compelled agreement constituted an agreement to conspire. JA 5236. This question suggests that the jury was considering whether the evidence was sufficient to prove Demerieux's intent, *see* JA 5265, and the exclusion of Clarke's statement could affect that consideration.

For these reasons, this Court should find that introduction of the statements at issue with neutral pronoun redactions was unconstitutional and that such introduction was not harmless beyond a reasonable doubt.

37

## IV.   DEFENDANTS WERE DENIED A FAIR TRIAL DUE TO THE PRESENTATION OF FALSE EVIDENCE AND THE LATE DISCLOSURE OF MATERIAL EVIDENCE

Contrary to the Government's briefing, the Government's own actions deprived Defendants of a fair trial because the Government (1) knowingly introduced false evidence in violation of *Napue v. Illinois*, 360 U.S. 264, 269 (1959), and (2) violated its obligations under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), by disclosing material, favorable evidence in the midst of trial when Defendants could no longer use it effectively.  The false evidence in "any reasonable likelihood [could] have affected the judgment of the jury," *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue*, 360 U.S. at 271), and the belated disclosures "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict," *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

### A.   The Government Presented False Evidence in Violation of *Napue v. Illinois*

#### 1.   Standard of Review

The Government incorrectly contends that this Court may review the instant *Napue* claims only for plain error because they were not raised below.  Gov't Br. 152.  However, Demerieux preserved these claims.  In support of his motion for a new trial, Demerieux argued that the Government mischaracterized evidence and affirmatively used false testimony in violation of his Fifth Amendment right to due

process—the very right the Supreme Court sought to protect in *Napue* and its progeny.  JA 1386; Defs. SA 008; *see Napue*, 360 U.S. at 265 ("The question presented is whether on these facts the failure of the prosecutor to correct the testimony of the witness which he knew to be false denied petitioner due process of law in violation of the Fourteenth Amendment . . . ."); *United States v. Iverson*, 637 F.2d 799, 801 (D.C. Cir. 1980) ("[B]oth before and after Brady, in decisions now generally considered under the Brady rubric, the Court has held that a conviction obtained by the knowing use of perjured testimony violates the defendant's right to a fair trial mandated by the due process clauses of the Fifth and Fourteenth Amendments."), *modified*, 648 F.2d 737 (D.C. Cir. 1981).

The right to appeal is not forfeited because a defendant failed to rely on specific case law.  *See United States v. Rashad*, 396 F.3d 398, 401 (D.C. Cir. 2005) ("All a defendant need do to preserve a claim of error . . . is inform the court and opposing counsel of the ruling he wants the court to make and the ground for so doing; he need not cite the particular case that supports his position.").  "It is indeed the general rule that issues must be raised in lower courts in order to be preserved as potential grounds of decision in higher courts.  But this principle does not demand the incantation of particular words; rather, it requires that the lower court be fairly put on notice as to the substance of the issue." *Nelson v. Adams USA, Inc.*, 529 U.S. 460, 469 (2000).  The substantive issue before this Court is

whether the Government's actions deprived Demerieux of a fair trial, and the general rule as to preservation of the issues "does not prevent [this Court] from declaring what due process requires in this case, for that matter was fairly before the [district court.]" *Nelson*, 529 U.S. 460, 469-70.

Demerieux based his due process argument in part on the Government's belated disclosure of, and testimony related to, the false campsite. JA 1397-98 ("On the morning of June 24, 2009, the government informed counsel and the court, for the first time, that its position would be that Zion Clarke took the FBI and TTPS to the wrong site on January 6, 2006. This was after FBI agent Clauss testified that at the January 6 site, he and agent Cruz collected items of evidentiary value, and submitted the items to the FBI laboratory for analysis."). Demerieux further argued that the Government violated his due process rights when it failed to disclose x-rays that "conclusively demonstrated that the skull was not damaged" and instead "introduced statements . . . , for their truth, that Demerieux dented Maharaj's head with a big stone." JA 1387-88. Demerieux elaborated on this point in his reply in support of his motion for a new trial:

> The government compounded the failure to timely turn over the x-ray by affirmatively using the evidence it knew or should have known was false. . . . . The government had every reason to question the veracity of the evidence, but instead it introduced the evidence to show the jury that Demerieux committed acts of violence against Maharaj, and withheld from counsel for Demerieux the x-ray that squarely refuted the testimony.

Defs. SA 007. This Court should not circumscribe its review because Demerieux did not explicitly rely on the *Napue* case in framing his due process arguments.

### 2.    The False Evidence

The Government wrongly maintains that it did not present false evidence because the evidence presented technically was correct. With respect to the false campsite, the Government argues that TTPS Sergeant Lucas and FBI Agent Clauss "testified with 100% accuracy, choosing their words carefully." Gov't Br. 153. The Government's argument elevates form over substance. As the district court acknowledged, "most—including the Court—were left with the impression that Clauss's testimony about the initial campsite was, in fact, a reference to the real campsite." *Clarke IV*, 767 F. Supp. 2d 12, 52 (D.D.C. 2011). Moreover, not all of the testimony was so carefully worded as the select examples in the Government's brief. *See* Gov't Br. 153. On cross-examination, for example, Clauss agreed that the agents collected evidence from, and took photographs of, the campsite and did not dispute defense counsel's characterization of the campsite as a "crime scene." JA 3921-22. The Government had an obligation to correct this testimony. *See Iverson*, 637 F.2d at 805 n.19 ("[I]t makes no difference whether the testimony is technically perjurious or merely misleading . . . .").

The false campsite debacle was more than a "moment of confusion" at trial as the Government suggests by quoting the district court. Gov't Br. 153 (quoting

JA 1796).  The Government set the stage with Cooperator testimony about the

"campsite" where Mr. Maharaj was held captive, *see, e.g.*, JA 3067-80, and later

elicited testimony from Agent Clauss that on January 6, 2006, TTPS and FBI

agents followed Defendant Clarke to a remote campsite in the woods and spent two

hours at the scene, JA 3826-27.  The Government knew that the January 6, 2006

campsite was not a crime scene, but this information came to light only when

Defendants pressed for an explanation of a diagram that the Government faxed to

them with a "false campsite" notation three weeks into trial.[14]  JA 3942.  The

stipulation that Mr. Maharaj was never held at the campsite visited on January 6,

2006 was just that: a stipulation, not a panacea for the Government's *Napue*

violation.  The Government's presentation of evidence created confusion about the

location of the crime, and this reasonably could have affected the jury's decision.

The Government also incorrectly argues that Percival's testimony was not

technically false because "Percival never declared that he *saw* Demerieux hit

Maharaj with a rock.  Percival said that he *heard* Kenneth Pierre say that

Demerieux hit Maharaj with a rock."  Gov't Br. 154.  This argument is inapposite

---

[14] The Government suggests that it was Defendants who thwarted its effort to clarify the record as to the scene of the crime, quoting the trial prosecutor's mistaken recollection that such "'testimony was struck' when defense counsel objected."  Gov't Br. 125 (citing JA 3827-28, 3945).  The Government does not cite any stricken testimony of this nature, and indeed the record reflects that the prosecutor, not defense counsel, interrupted Clauss's testimony.  JA 3827.

because the Government admitted to introducing this hearsay statement for the truth of the matter asserted.  JA 4620.  The Government suggests that the statement may have been true, but this speculation obfuscates that neither a hand lens nor an x-ray supported the statement that Demerieux hit Mr. Maharaj with a rock and "dent[ed] his head."[15]  JA 3436, 4878.  Thus, the Government once again seeks to evade the conclusion it should have reached at trial—the hearsay statement was entirely contradicted by other evidence, was false, and never should have been introduced.  *Cf. United States v. Wallach*, 935 F.2d 445, 457 (2d Cir. 1991) ("Defendants placed before the government and the court powerful evidence that Guariglia was lying. . . . [T]his information . . . cast a dark shadow on the veracity of Guariglia's statements.  We fear that given the importance of Guariglia's testimony to the case, the prosecutors may have consciously avoided recognizing the obvious—that is, that Guariglia was not telling the truth.").

**B.    The Government Failed to Disclose Material Evidence in Time for Defendants to Use It Effectively**

Late disclosure of material evidence exacerbated the Government's presentation of false evidence.  Specifically, the Government withheld evidence that (1) revealed that the campsite visited by TTPS and FBI personnel was not the location of the hostage-taking, (2) exposed the falsity of evidence that one of the

---

[15] Dr. Des Vignes testified that "[i]f there was a dent in the head, the X-ray would show that damage."  Gov't SA, Tab 4, at 5623.

43

Defendants violently struck the victim, and (3) suggested that other individuals committed the acts for which two Defendants were charged.

### 1.   Standard of Review

In its brief, the Government incorrectly relies on *United States v. Paxson*, 861 F.2d 730, 737 (D.C. Cir. 1988), to request that this Court review the denial of Defendants' *Brady* claims for clear error.  *See* Gov't Br. 123.  Since the *Paxson* case was decided, however, this Court has held that "once the existence and content of undisclosed evidence has been established, the assessment of the materiality of this evidence under *Brady* is a question of law."  *United States v. Oruche*, 484 F.3d 590, 595 (D.C. Cir. 2007).

Here, the Government does not dispute *when* it disclosed the materials at issue or the *content* of the late disclosures.  Instead, it argues that there is no *Brady* violation because certain Defendants were able to make effective use of the belatedly disclosed evidence—a point that Defendants contest.  Whether Defendants received the materials in time to make effective use of them is just another way of asking whether Defendants were prejudiced by the late disclosures, and thus should be part of the materiality inquiry that warrants de novo review (not the more deferential review for "clear error").  *See United States v. Celis*, 608 F.3d 818, 836 (D.C. Cir. 2010) (per curiam) (conducting a de novo review of the asserted untimely disclosures).

### 2.   Defendants Were Unable to Integrate the Mid-Trial Disclosures into Their Defense Strategies

Defense counsel attempted to mitigate the effects of the late disclosures.  But in evaluating whether Defendants received a fair trial, this Court should consider *why* Defendants had to make so many mid-trial adjustments.  As the district court acknowledged, the Government's late disclosures were "significant and recurring throughout the trial," *Clarke IV*, 767 F. Supp. 2d at 38, which only underscores the difficulty Defendants faced in attempting to integrate each piece of newly discovered exculpatory and impeachment evidence into their defense strategies in this case.  *See Leka v. Portuondo*, 257 F.3d 89, 101 (2d Cir. 2001) (noting "how difficult it can be to assimilate new information, however favorable, when a trial already has been prepared on the basis of the best opportunities and choices then available").

### a.   The False Campsite Evidence

In the midst of trial, Defendants learned that Mr. Maharaj was never held at the campsite where Defendant Clarke allegedly led the FBI and TTPS.  The Government apparently believes that disclosing such critical information nearly one month into a two-month trial satisfies its *Brady* obligations.  *See* Gov't Br. 133.  This Court should put that illusion to rest.  *See United States v. Daum*, 847 F. Supp. 2d 18, 20 (D.D.C. 2012) ("[O]ur Court of Appeals has cautioned that the

Government should be erring on the side of disclosure when interpreting its

*Brady/Giglio* obligations.").

Responsible counsel cannot be expected to overhaul a defense strategy in the

middle of trial in order to advance new theories of the case. And under these

circumstances, re-cross of Agent Clauss was not a viable option for Clarke. JA

3951 ("Mr. O'Toole: . . . I certainly wouldn't want to get Mr. Clauss on the stand

and ask him, was this a false campsite? I don't know; it could have been the real

campsite. I feel totally blind-sided here."). Faced with the predicament of letting

the false impression created by Clauss's testimony stand or venturing into

unexplored territory on re-cross, Clarke logically agreed to a stipulation. The

Government's late disclosure thus deprived Clarke of the opportunity to use the

false campsite information to aid his defense from the beginning of the trial.

### b.    Clauss's Grand Jury Testimony and the X-ray

The Government withheld until almost five weeks into trial two pieces of

evidence that directly contradicted the statement (introduced through Percival) that

Demerieux struck the victim: first, Clauss's grand jury testimony that the "lead

homicide detective in Trinidad advised me that after those allegations came out by

Percival, he . . . had the Forensic Science Center reexamine the skull with X-rays,

to see if there were any hairline fractures or anything of the sort to support the

allegation, and it all resulted negative," JA 4611, and second, the x-ray results.

46

The Government once again clings to the mantra that Percival was only relating what he heard, and thus his testimony had "limited probative value." Gov't Br. 141.  But the purpose and effect of introducing the prejudicial statement is plain: to depict Demerieux as a ruthless guard who violently attacked Mr. Maharaj.  *See* JA 4616 ("THE COURT: Casual chatter makes no sense.  It was put in to establish some violent activity by one or more defendants with respect to the victim.").  The Government inappositely argues that Demerieux's counsel made effective use of the x-ray on several occasions.  However, defense counsel's attempts to use the x-ray to refute the notion that Demerieux struck Mr. Maharaj were offset by additional, unwanted attention to the gruesome nature of the accusation itself and by the Government's improper attempts to corroborate the false statement in closing.  *See* JA 5197 (arguing that Mr. Maharaj "did look beaten" and "the people who were guarding him when he looked beaten were Kevon Demerieux and Zion Clarke").

### c.    Russel Joseph's Original Confession

As Defendants explained in their opening brief, Russel Joseph, the self-professed getaway driver during the Maharaj kidnapping, initially identified Ricardo Stevenson, not Defendant Ricardo De Four, as the driver of the "clear car"

47

that paved the way for his getaway car.[16]  The Government produced the exculpatory statement only hours before Joseph took the stand and testified that De Four was the driver of the clear car.

The Government claims that it was sufficient that De Four had the statement in time to effectively cross-examine Joseph.  Gov't Br. 146.  The statement's value, however, was not limited to impeachment, but was a lead to specific exculpatory evidence of third-party guilt.  The constitutional error, therefore, is that the late disclosure denied De Four a meaningful opportunity to prepare and present that evidence.  *See Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (the Constitution guarantees a criminal defendant's right to "a meaningful opportunity to present a complete defense"); *Strickland v. Washington*, 466 U.S. 668, 686 (1984) ("Government violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense.").

---

[16] In this statement, Joseph also indicated that a man named "Tee" abducted Mr. Maharaj, when this was the role attributed to Sealey at trial.  *See* Defs. Br. 87. Thus, Sealey was placed in much the same position as De Four—he was faced with late-breaking exculpatory evidence with inadequate time to investigate it or find corroboration to support the conclusion that he was not present.  Particularly in light of the weakness of the evidence against him (save for the unconstitutional confession secured from him) and the evident confusion about the identity of the abductor of Mr. Maharaj (as demonstrated by the inconsistent closing arguments made by the Government), the failure to disclose this exculpatory evidence in a timely manner prejudiced Sealey.

The defense did not have "plenty of time" to pursue evidence about Stevenson, as the Government claims. Gov't Br. 147-48. When disclosure is made during trial "[t]he defense may be unable to divert resources from other initiatives and obligations that are or may seem more pressing." *Leka*, 257 F.3d at 100. In this case, De Four's more pressing initiative was to obtain Trinidad and Tobago Defense Force ("TTDF") records that would establish that he was at work when the Government claimed he was clearing the roads. Defense resources had to be expended during trial to obtain those records because the court denied De Four's motion to continue the trial, in part because "De Four had at least a month until it was time to present his defense case" to secure those records.[17] *Clarke IV*, 767 F. Supp. 2d at 75. As a result of those efforts undertaken during trial, some records were released to the defense on July 6, 2009, the day the Government rested its case.[18] *Id*. at 78.

The Government wrongly suggests that counsel's "five day excursion to Trinidad" on July 9, 2009 provided sufficient opportunity to prepare and present an

---

[17] The district court also believed that "there was little likelihood that De Four would obtain from Trinidad authorities the evidence he described—his 'military service records including attendance records'—in light of Trinidad's lack of response to the previous letters rogatory issued by the Court." *Clarke IV*, 767 F. Supp. 2d at 76.

[18] A detailed chronology of the defense efforts to obtain TTDF records from November 21, 2008 through trial was set forth in De Four's Motion for a New Trial. JA 1542-48.

entirely new defense.  Gov't Br. 144-45.  The purpose of that "excursion"—two

days of which were spent traveling to and from Trinidad—was to depose defense

witnesses for trial.  While in Trinidad, the defense was preoccupied with locating,

interviewing, and convincing persons with knowledge of the recently obtained

TTDF alibi records to testify.  Six witnesses who ultimately agreed to testify on

De Four's behalf were deposed,[19] as were six other witnesses called by

Codefendants.  JA 1519-20.  Given these pressing obligations, the defense had

neither sufficient time nor resources to research the law and investigate the facts in

order to make reasonable strategic decisions about presenting a third-party

perpetrator defense.

As a result, counsel did not recognize in time the potential admissibility of

the Gerald Gopaul hostage taking as independent evidence that Stevenson drove

the clear car.  Nevertheless, the Government faults the defense, claiming that

counsel "should have" been alerted to its potential relevance by the combination of

the "late May disclosure of Joseph's statement and the early June disclosure of

Percival's preliminary hearing transcript" about the Gopaul hostage taking.  Gov't

---

[19] Those witnesses were Rodney Wilkes, Dave Maharaj, Richard Horsham, Calvin
Adams, Ansel Newton, and Mervyn Phillips all of whom were active TTDF
military.  Because the defense lacked subpoena power to compel witnesses, it had
to cajole these witnesses into testifying voluntarily, despite the TTDF's lack of
cooperation with the defense, as evidenced in its response to repeated requests for
TTDF records.

Br. 149.  There is no reason why counsel "should have" recognized the potential admissibility of that evidence amidst the pressures of trial.  The defense conducted no pretrial investigation of the Gopaul crime, because the district court's July 28, 2008 ruling precluding the Government from introducing that evidence, *Straker*, 567 F. Supp. 2d at 179, preceded De Four's August 5, 2008 extradition to the United States, and the appointment of counsel, JA 59.[20]

Upon sufficient reflection, counsel did recognize the value of the Gopaul hostage taking shortly after trial and argued the issue in De Four's post-verdict motion.  JA 1529-30.  Given the same amount of time to reflect prior to trial, defense counsel would have undoubtedly achieved the same insight.  *See Leka*, 257 F.3d at 103 ("The opportunity for use under *Brady* is the opportunity for a responsible lawyer to use the information with some degree of calculation and forethought.").  Thus, any fault of counsel in not recognizing this unexpectedly important piece of evidence in time to utilize it effectively was due to the Government's failure to timely comply with its *Brady* obligation.  *See United States v. Washington*, 294 F. Supp. 2d 246, 249-50 (D. Conn. 2003) ("[R]ather than signaling a lack of prejudice, the fact that defense counsel did not

---

[20] Trial counsel did not begin representation until March 9, 2009.  JA 82.

immediately pick up on the full value of the impeachment evidence to his case seems itself to be indicative of the prejudice of the late disclosure.").

The Government suggests in a footnote that the court might have ruled the Gopaul evidence inadmissible. Gov't Br. 150 n.74. Contrary to the Government's suggestion, the high probative value of this alternative perpetrator evidence is not discounted by the fact that "a rotating cast of characters" were alleged to have participated in the three Rule 404(b) hostage takings introduced by the Government. *Id.* None of those hostage takings had a clear car driver. Moreover, it was the Government's theory that De Four drove the clear car because he was a member of the military and less likely to get stopped by the authorities. JA 2779. Stevenson was also a member of the military and, according to Percival, drove the clear car for the Gopaul hostage taking because De Four was working. JA 1558. Joseph's initial identification of Stevenson, coupled with De Four's evidence that he was working on the day that Mr. Maharaj was taken hostage, makes the Gopaul hostage taking evidence highly probative on the issue of the identity of the clear car driver.

The Government nevertheless suggests that Codefendants would have been unfairly prejudiced by admission of the evidence. Gov't Br. 150 n.74. To the extent that prejudice to Codefendants could not otherwise be remedied, severance, not exclusion of exculpatory evidence, is the appropriate remedy. *See Zafiro v.*

*United States*, 506 U.S. 534, 539 (1993) ("[A] defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial.").

In declaring the evidence of De Four's guilt "overwhelming," the Government fails to consider any defense evidence or the impact that the Gopaul evidence would have had in casting doubt on the Government's evidence against him. Gov't Br. 151. The Government's case hinged primarily on Percival and Joseph, who both of whom testified that De Four drove the clear car, as well as on De Four's so-called "confession," all of which would have been significantly undermined by the third-party perpetrator evidence.[21]

Except for driving the clear car, Percival's account of De Four's involvement was largely uncorroborated and, in some cases, flatly contradicted by other Cooperators. *See, e.g.*, Defs. Br. 108-09. Percival's Trinidad testimony that Stevenson drove the clear car for the Gopaul hostage taking, together with De Four's partial alibi evidence, would have fueled additional cross-examination

---

[21] Other testimony from Cooperators was less damaging. Leon Nurse vaguely testified about a meeting at the Mellow Moods bar in which he believed De Four may have been present. Defs. SA 024-26. Nurse denied the occurrence of a planning meeting that Winston Gittens claimed occurred at Nurse's house (for which De Four allegedly was present). Defs. SA 035, 028. Moreover, Gittens was unable to even make a courtroom identification of De Four despite multiple attempts. Defs. SA 030-33.

of Percival to discredit his claim that De Four was the clear car driver.  Absent the Gopaul evidence and additional cross examination, the defense had a far weaker argument that Percival was totally fabricating De Four's role.  JA 2809.

Although Joseph maintained that he was lying when he initially identified Stevenson as the clear car driver, probing that contention in the context of Stevenson and Joseph both playing the identical roles in the Maharaj kidnapping as they had each played in the Gopaul kidnapping would have been far more effective.  Absent the Gopaul evidence, the defense had a far weaker argument that Joseph recanted his initial identification of Stevenson only in order to ingratiate himself with the Government after Percival identified De Four as the driver.

Damage to the Government's case would not have been limited to discrediting those two prosecution witnesses.  The Gopaul evidence also would have strengthened De Four's evidence regarding the unreliability of his "confession" and his partial alibi evidence.  Defs. Br. 107, 109-10.  Because the Gopaul evidence would have resulted in a markedly weaker case for the prosecution and a stronger one for the defense, De Four was denied a fair trial by the Government's late disclosure.

### C.    The False Evidence and Late Disclosures Had a Material Impact on the Fairness of Defendants' Trial

The Government fails to address the cumulative impact of its false evidence and late disclosures on the trial.  Instead, it attempts to compartmentalize and

downplay the effects of its actions, arguing that the false evidence it presented was not technically false and that its late disclosures were "defendant-specific" (and relate only to Clarke, Demerieux, and De Four).  The Government wholly ignores that its belated disclosures perpetuated a central misconception of the trial—the location of the crime—shared by the defense, the court, and, undoubtedly, the jury.  The Government ignited this misconception when it produced forty-four photographs of the (false) campsite in discovery, *see* JA 3987-88, and allowed it to spread unchecked—even as Demerieux's counsel represented to the jury in opening statements that the Government recovered no evidence from the false campsite linking her client to the crime, *see* JA 1397-98, and Cooperators repeatedly referred to the place where they allegedly held the victim as a "campsite," *see, e.g.*, JA 3069, 3629.  Then, the Government's own agent testified that he accompanied Clarke to the campsite where the victim purportedly was held.  The totality of the false campsite evidence marred the entire trial and cannot be entirely reduced, as the Government would like, to the discrete issue of whether Clarke knew the location of the campsite.  At its core, the false campsite evidence calls into question the scene of the crime and the credibility of the witnesses, resulting in prejudice to all Defendants.

Clauss's grand jury testimony, the x-ray, and Joseph's original confession were equally material.  Clauss's grand jury testimony and the x-ray clearly

demonstrate that Demerieux did not strike Mr. Maharaj in the head, but by the time the Government disclosed this pertinent evidence, the jury had already heard the damaging allegation.  Demerieux was placed in the untenable position of attempting to "unring a bell" without calling additional, unwanted attention to a gruesome accusation.  The Government also belatedly disclosed a confession from Joseph, a key Cooperator, that implicated individuals other than De Four and Sealey in the acts for which they were charged.  This information came much too late for Defendants to thoroughly investigate and develop a third-party perpetrator defense.  The aforementioned evidence had particular exculpatory value for Demerieux, De Four, and Sealey, but it also called into question the credibility of two of the Government's key Cooperators (Percival and Joseph)—an issue germane to all Defendants.

The Government wrongly asserts that any false evidence or late-disclosed *Brady* material did not affect the outcome of the trial because the evidence against Defendants was "overwhelming."  Defendants oppose this characterization, which incorrectly assumes that the balance of the Government's evidence was both credible and complete.  This Court should bear in mind that the Government repeatedly breached its disclosure obligations and failed to safeguard the truth in

Defendants' trial.[22]  Its handling of the false campsite and false hearsay evidence and delayed disclosures, whether viewed individually or collectively, resulted in a deprivation of due process in violation of *Napue* and *Brady*.

## V.    DEFENDANT SEALEY'S *MIRANDA* RIGHTS WERE VIOLATED

In Defendants' opening brief, Sealey argued that the district court erred in failing to suppress his confession, which was procured in violation of his privilege against self-incrimination.[23]  Defs. Br. 115-21.  Specifically, the trial court erred when it concluded that there was no joint venture between the FBI and TTPS. *United States v. Straker*, 596 F. Supp. 2d 80, 107 (D.D.C. 2009).  As a result, the court made the further mistake of concluding that the absence of *Miranda* warnings at the outset of the interrogations was of no moment.  *Id.*

In asserting that *Miranda* warnings were not required because the FBI was not "coordinating or directing" the Trinidadian investigation, the Government

---

[22] In the Brief for Appellants, Defendants mistakenly quoted the dissent in *Arizona v. Youngblood*, 488 U.S. 51 (1988), for the proposition that the Government should be held to a higher standard, given its special obligation to serve the cause of justice.  The Government's obligation is well established in majority opinions elsewhere.  *See, e.g.*, *Strickler v. Greene*, 527 U.S. 263, 281 (1999) ("[W]e have said that the United States Attorney is 'the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.'" (quoting *Berger v. United States,* 295 U.S. 78, 88 (1935))).

[23] Demerieux also maintains that his statements to the TTPS and the FBI should have been suppressed, but rests on the arguments in Defendants' opening brief.

unduly restricts the applicability of the joint venture exception.  Gov't Br. 164.

Under the Government's theory, there can be no joint venture unless U.S. agents

"tell the Trinidadian authorities what 'they should or shouldn't do.'"  Gov't Br.

158 (quoting Agent Clauss).  Although such overt instruction would be indicative

of a joint venture, it is not the *only* way to demonstrate a joint venture.  The district

court also should have considered whether the cooperation between the FBI and

TTPS allowed these entities to evade the constitutional protections of *Miranda*.

*See United States v. Delaema*, 583 F. Supp. 2d 104, 107 (D.D.C. 2008) (A "joint

venture arises where (1) U.S. agents actively participate in the questioning [at

issue]; (2) the foreign officials are acting as agents *or virtual agents* of the U.S.

government[;] or (3) the cooperation [among American and foreign officials] was

designed to evade constitutional restrictions on U.S. agents." (alterations in

original) (internal quotation marks omitted)).

When TTPS first interviewed Sealey, FBI Special Agent Freeman sat in a

cubicle just ten feet away and could hear the interrogation taking place.  *Straker*,

596 F. Supp. 2d 80, 103 (D.D.C. 2009); JA 2296-97.  Immediately after TTPS

concluded its interrogation, Agent Freeman began his own interview, during which

Sealey executed an advice of rights form.  *Straker*, 596 F. Supp. 2d at 104-05; JA

2298-99.

The Government's effort to portray the FBI's involvement as mere presence is unavailing.  Freeman's follow-on interrogation occurred within seconds of the so-called independent TTPS interview, and thus resembles the improper tactics used in *Missouri v. Seibert*, 542 U.S. 600 (2004) (plurality opinion)—a case that the Government tries, unsuccessfully, to distinguish in a footnote.  *See* Gov't Br. 167 n.82.  Although there was no evidence of a protocol that directed the FBI to swoop in after TTPS secured a confession, the process of TTPS interrogation followed immediately by FBI interrogation is almost directly parallel to the two-step interrogation technique employed in *Seibert* and had the same practical effect.  As in *Seibert*, the first, un-*Mirandized* interrogation left "little, if anything, of incriminating potential left unsaid," making it "unnatural" not to "repeat at the second stage what had been said before."  542 U.S. at 616-17.  And, as in *Seibert*, the *Miranda* warnings given before the second interrogation did not "effectively advise the suspect that he had a real choice about giving an admissible statement," because the first and second interrogations blended into one "continuum."  *Id.* at 612, 617.  As a result, the district court's conclusion that any statements Sealey made were voluntary is error.  Rather, Sealey was effectively coerced by the design of the interrogation.

For these reasons, the district court should have suppressed Sealey's confessions.

## VI.   DEFENDANT SEALEY WAS PREJUDICED BY IMPROPER JOINDER

In Defendants' opening brief, Defs. Br. 122-24, Sealey established that, even accepting the Government's evidence as true, he was but a minor pawn in a much larger scheme.  Sealey was prejudiced by his implicit connection to Mr. Maharaj's death and the horrific and gruesome dismemberment that was the centerpiece of the Government's case.  As a consequence, his trial ought to have been severed from that of his Codefendants.

The Government attempts to minimize the prejudicial nature of joinder by arguing that the district court properly instructed the jury to compartmentalize the dismemberment evidence.  Gov't Br. 169-77.

However, in rejecting Sealey's severance argument, the Government effectively concedes the case.  It acknowledges, as it must, that the governing standard is whether the evidence "against one defendant is 'far more damaging' than the evidence'" against the defendant seeking severance, and that a "*dramatic* disparity of evidence" cannot be cured by a jury instruction.  *Moore*, 651 F.3d  at 95 (citation omitted).  That, of course, is precisely this case.

The Government makes much of the evidence of Sealey's alleged participation in the initial kidnapping.  But that evidence was not as strong as the Government suggests: the eyewitness testimony was equivocal, and there was no

60

forensic evidence that linked him to the kidnapping, much less the months-long conspiracy charged in the indictment.

In stark contrast, the Government spent weeks presenting evidence related to *other* crimes—none of which pertained to Sealey—as well as testimony regarding the dismemberment of Mr. Maharaj—which again did not pertain to Sealey. The Government contends that these ancillary issues were not a major part of its case. It argues, for example, that the testimony about the dismemberment of Mr. Maharaj occupies a mere five transcript pages. Gov't Br. 175. But for something the Government now seeks to characterize as de minimis, the horrific facts figured prominently in the Government's closing argument as a means of bolstering the alleged veracity of its cooperating witnesses. *See, e.g.*, Defs. SA 037-38, 042. In short, the Government's argument (and the district court's decision) ignores reality. This Court is being asked to approve a conviction in the first instance based upon a kidnapping under a theory of derivative liability for the subsequent (unanticipated) death of the kidnapping victim. Worse yet, that death is conjoined with the spillover from the other uncharged kidnappings for which Sealey bore no responsibility.

It is simply too much to accept the premise that the Government's case against Sealey was not buttressed by the "*dramatic* disparity" in evidence arising from these other unrelated matters. The district court's denial of severance was not

61

harmless because Sealey was prejudiced by his implicit connection to

Codefendants.  And the jury instructions could not cure any prejudice from this

joinder, as no reasonable jury member could put these facts out of his or her mind.

## VII.  THE DISTRICT COURT ABUSED ITS DISCRETION BY FAILING TO SEVER DEFENDANT STRAKER

While acknowledging that severance is "required when the evidence against

one defendant is 'far more damaging' than the evidence against the moving party,"

*Moore*, 651 F.3d at 95 (citation omitted), the Government argues that the district

court did not abuse its discretion by denying severance because there was

"substantial and independent evidence of . . . Straker's involvement in the

conspiracy."  Gov't Br. 170.

In support of its argument that there existed substantial and independent

evidence of Straker's involvement in the charged offenses, the Government relies

upon the testimony of Cooperators Nurse, Percival, and Joseph.  Each of the three

witnesses testified pursuant to a plea agreement with the United States, and each of

the three witnesses had both a motive to falsify their testimony and a bias to curry

favor with the Government.  It was only by virtue of their testimony against

Straker that they were able to achieve the benefits of a plea agreement.

This case most closely resembles *United States v. Novo Sampol*, 636 F.2d

621 (D.C. Cir. 1980) (per curiam), which involved the assassination of former

Chilean Ambassador Orlando Letelier and one of his associates.  This Court

62

determined that a combination of the following factors constituted an abuse of discretion by the trial court in refusing to grant Ignacio Novo Sampol's motion for severance of defendants: (1) Ignacio had been charged only with misprision of a felony and making false statements to a grand jury, while his codefendants were on trial for conspiring to murder and murdering Orlando Letelier and his associate, and (2) Ignacio was a leader of an organization that was implicated in the conspiracy. *Id.* at 642, 644, 651.

With respect to Sampol being charged only with lesser offenses than his codefendants, this Court ruled that given the:

> gross disparity in the quantity and venality of the testimony against the respective joint defendants it is fair to inquire "whether the jury can reasonably be expected to compartmentalize the evidence as it relates to separate defendants in the light of its volume and limited admissibility."

*Id.* at 647 (citing *United States v. Gaines*, 563 F.2d 1352, 1355 (9th Cir. 1977)). The Court further found that Ignacio's involvement with an organization implicated in the conspiracy "created the false impression that Ignacio was involved in the conspiracy." *Id.* at 644.

Straker's argument concerning the need for severance is rooted in the admission of the Rule 404(b) evidence, none of which applied to him. The testimony concerning the other crimes was immensely prejudicial—particularly against those who were not alleged to have participated in the uncharged crimes.

63

The Government's argument that the jury could compartmentalize the evidence is not the least bit persuasive.  Rather, the argument reinforces the position of Straker that his case should have been severed. The Government argues "the government devoted less than nine hours of court time to the presentation of its other-crimes evidence."  Gov't Br. 176.  Nine hours of trial testimony is a significant amount of testimony regardless of the length of the trial.  In addition, the Government placed great emphasis on the other crimes evidence in both its opening statement and its closing argument.

In sum, the disparity in evidence created by admission of the uncharged Rule 404(b) evidence was extraordinarily prejudicial.  The trial court erred in failing to sever Straker.

## CONCLUSION

For the foregoing reasons, the district court's judgments should be reversed.


Dated: October 11, 2013                    Respectfully submitted,

                                           /s/ Christopher S. Rhee
                                           Christopher S. Rhee*
                                           Leeann R. Morentz
                                           Andrew M. Treaster
                                           Victoria L. Killion
                                           Andrew Macurdy
                                           ARNOLD & PORTER LLP
                                           555 Twelfth Street, NW
                                           Washington, DC  20004
                                           (202) 942-5000

                                           *Counsel for Appellant Kevon Demerieux*

                                           * Counsel for Demerieux was appointed
                                           by the District Court for the District of
                                           Columbia pursuant to 18 U.S.C.
                                           § 30006A.

/s/ Paul Rosenzweig
Paul Rosenzweig
501 C Street, NE
Washington, DC  20002
(202) 547-0660

*Counsel for Appellant*
*Christopher Sealey*

/s/ Charles B. Wayne
Charles B. Wayne
DLA PIPER LLP
500 Eighth Street, NW
Washington, DC  20004
(202) 799-4253

*Counsel for Appellant Wayne Pierre*

/s/ Pleasant S. Brodnax, III
Pleasant S. Brodnax, III
1701 Pennsylvania Avenue, NW
Suite 300
Washington, DC  20006
(202) 462-1100

*Counsel for Appellant Kevin Nixon*

/s/ Jeffrey B. O'Toole
Jeffrey B. O'Toole
O'TOOLE ROTHWELL
1350 Connecticut Avenue, NW
Suite 200
Washington, DC  20036
(202) 775-1550

*Counsel for Appellant Zion Clarke*

/s/ Jonathan Zucker
Jonathan Zucker
1350 Connecticut Avenue, NW
Suite 202
Washington, DC  20036
(202) 624-0784

*Counsel for Appellant Ricardo De Four*

/s/ Steven R. Kiersh
Steven R. Kiersh
5335 Wisconsin Avenue, NW
Suite 440
Washington, DC  20015
(202) 347-0200

*Counsel for Appellant Anderson Straker*

## CERTIFICATE OF COMPLIANCE

(1) The foregoing Reply Brief for Appellants complies with the type

volume limitation of the July 16, 2012 Scheduling Order because this brief

contains 14,995 words, excluding the parts of the brief exempted by Fed. R. App.

P. 32(a)(7)(B)(iii) and D.C. Cir. Rule 32(a)(1).

(2) This brief also complies with the typeface requirements of Fed. R. App.

P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it

has been prepared in a proportionally spaced typeface using Microsoft Word 2007,

in 14-point Times New Roman font.


Dated: October 11, 2013                    Respectfully submitted,

                                           /s/ Christopher S. Rhee
                                           Christopher S. Rhee
                                           ARNOLD & PORTER LLP
                                           555 Twelfth Street, NW
                                           Washington, DC  20004
                                           (202) 942-5000

                                           *Counsel for Appellant Kevon Demerieux*

# CERTIFICATE OF SERVICE

I hereby certify that, on October 11, 2013, I filed the foregoing Reply Brief for Appellants with the Clerk of the Court via hand delivery due to technical errors with the electronic filing system.  Notice of the filing will be sent by electronic mail and will also be sent via the electronic filing system as soon as electronic filing is able to be completed.  Nine paper copies will be filed with the Court, and two paper copies will be sent via Federal Express Priority overnight to the following counsel:

David B. Goodhand
Assistant United States Attorney
555 Fourth Street, NW
Room 8104
Washington, DC 20530
(202) 252-6768


Dated: October 11, 2013                    /s/ Christopher S. Rhee
                                           Christopher S. Rhee
                                           ARNOLD & PORTER LLP
                                           555 Twelfth Street, NW
                                           Washington, DC 20004
                                           (202) 942-5000

                                           *Counsel for Appellant Kevon Demerieux*

# ADDENDUM

18 U.S.C. § 1961(4)

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part I. Crimes (Refs & Annos)
      Chapter 96. Racketeer Influenced and Corrupt Organizations (Refs & Annos)

18 U.S.C.A. § 1961

§ 1961. Definitions

Effective: March 7, 2013
Currentness

As used in this chapter--

**(1)** "racketeering activity" means (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472, and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891-894 (relating to extortionate credit transactions), section 1028 (relating to fraud and related activity in connection with identification documents), section 1029 (relating to fraud and related activity in connection with access devices), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to financial institution fraud), section 1351 (relating to fraud in foreign labor contracting), section 1425 (relating to the procurement of citizenship or nationalization unlawfully), section 1426 (relating to the reproduction of naturalization or citizenship papers), section 1427 (relating to the sale of naturalization or citizenship papers), sections 1461-1465 (relating to obscene matter), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1512 (relating to tampering with a witness, victim, or an informant), section 1513 (relating to retaliating against a witness, victim, or an informant), section 1542 (relating to false statement in application and use of passport), section 1543 (relating to forgery or false use of passport), section 1544 (relating to misuse of passport), section 1546 (relating to fraud and misuse of visas, permits, and other documents), sections 1581-1592 (relating to peonage, slavery, and trafficking in persons)., [1] section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), section 1956 (relating to the laundering of monetary instruments), section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity), section 1958 (relating to use of interstate commerce facilities in the commission of murder-for-hire), section 1960 (relating to illegal money transmitters), sections 2251, 2251A, 2252, and 2260 (relating to sexual exploitation of children), sections 2312 and 2313 (relating to interstate transportation of stolen motor vehicles), sections 2314 and 2315 (relating to interstate transportation of stolen property), section 2318 (relating to trafficking in counterfeit labels for phonorecords, computer programs or computer program documentation or packaging and copies of motion pictures or other audiovisual works), section 2319 (relating to criminal infringement of a copyright), section 2319A (relating to unauthorized fixation of and trafficking in sound recordings and music videos of live musical performances), section 2320 (relating to trafficking in goods or services bearing counterfeit marks), section 2321 (relating to trafficking in

certain motor vehicles or motor vehicle parts), sections 2341-2346 (relating to trafficking in contraband cigarettes), sections 2421-24 (relating to white slave traffic), sections 175-178 (relating to biological weapons), sections 229-229F (relating to chemical weapons), section 831 (relating to nuclear materials), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), (D) any offense involving fraud connected with a case under title 11 (except a case under section 157 of this title), fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), punishable under any law of the United States, (E) any act which is indictable under the Currency and Foreign Transactions Reporting Act, (F) any act which is indictable under the Immigration and Nationality Act, section 274 (relating to bringing in and harboring certain aliens), section 277 (relating to aiding or assisting certain aliens to enter the United States), or section 278 (relating to importation of alien for immoral purpose) if the act indictable under such section of such Act was committed for the purpose of financial gain, or (G) any act that is indictable under any provision listed in section 2332b(g)(5)(B);

**(2)** "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, any political subdivision, or any department, agency, or instrumentality thereof;

**(3)** "person" includes any individual or entity capable of holding a legal or beneficial interest in property;

**(4)** "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

**(5)** "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity;

**(6)** "unlawful debt" means a debt (A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof, or which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof, or the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate;

**(7)** "racketeering investigator" means any attorney or investigator so designated by the Attorney General and charged with the duty of enforcing or carrying into effect this chapter;

**(8)** "racketeering investigation" means any inquiry conducted by any racketeering investigator for the purpose of ascertaining whether any person has been involved in any violation of this chapter or of any final order, judgment, or decree of any court of the United States, duly entered in any case or proceeding arising under this chapter;

**(9)** "documentary material" includes any book, paper, document, record, recording, or other material; and

**(10)** "Attorney General" includes the Attorney General of the United States, the Deputy Attorney General of the United States, the Associate Attorney General of the United States, any Assistant Attorney General of the United States, or any

employee of the Department of Justice or any employee of any department or agency of the United States so designated by the Attorney General to carry out the powers conferred on the Attorney General by this chapter. Any department or agency so designated may use in investigations authorized by this chapter either the investigative provisions of this chapter or the investigative power of such department or agency otherwise conferred by law.

**CREDIT(S)**

(Added Pub.L. 91-452, Title IX, § 901(a), Oct. 15, 1970, 84 Stat. 941; amended Pub.L. 95-575, § 3(c), Nov. 2, 1978, 92 Stat. 2465; Pub.L. 95-598, Title III, § 314(g), Nov. 6, 1978, 92 Stat. 2677; Pub.L. 98-473, Title II, §§ 901(g), 1020, Oct. 12, 1984, 98 Stat. 2136, 2143; Pub.L. 98-547, Title II, § 205, Oct. 25, 1984, 98 Stat. 2770; Pub.L. 99-570, Title XIII, § 1365(b), Oct. 27, 1986, 100 Stat. 3207-35; Pub.L. 99-646, § 50(a), Nov. 10, 1986, 100 Stat. 3605; Pub.L. 100-690, Title VII, §§ 7013, 7020(c), 7032, 7054, 7514, Nov. 18, 1988, 102 Stat. 4395, 4396, 4398, 4402, 4489; Pub.L. 101-73, Title IX, § 968, Aug. 9, 1989, 103 Stat. 506; Pub.L. 101-647, Title XXXV, § 3560, Nov. 29, 1990, 104 Stat. 4927; Pub.L. 103-322, Title IX, § 90104, Title XVI, § 160001(f), Title XXXIII, § 330021(1), Sept. 13, 1994, 108 Stat. 1987, 2037, 2150; Pub.L. 103-394, Title III, § 312(b), Oct. 22, 1994, 108 Stat. 4140; Pub.L. 104-132, Title IV, § 433, Apr. 24, 1996, 110 Stat. 1274; Pub.L. 104-153, § 3, July 2, 1996, 110 Stat. 1386; Pub.L. 104-208, Div. C, Title II, § 202, Sept. 30, 1996, 110 Stat. 3009-565; Pub.L. 104-294, Title VI, §§ 601(b)(3), (i)(3), 604(b)(6), Oct. 11, 1996, 110 Stat. 3499, 3501, 3506; Pub.L. 107-56, Title VIII, § 813, Oct. 26, 2001, 115 Stat. 382; Pub.L. 107-273, Div. B, Title IV, § 4005(f)(1), Nov. 2, 2002, 116 Stat. 1813; Pub.L. 108-193, § 5(b), Dec. 19, 2003, 117 Stat. 2879; Pub.L. 108-458, Title VI, § 6802(e), Dec. 17, 2004, 118 Stat. 3767; Pub.L. 109-164, Title I, § 103(c), Jan. 10, 2006, 119 Stat. 3563; Pub.L. 109-177, Title IV, § 403(a), Mar. 9, 2006, 120 Stat. 243; Pub.L. 113-4, Title XII, § 1211(a), Mar. 7, 2013, 127 Stat. 142.)

## EXECUTIVE ORDERS

### EXECUTIVE ORDER NO. 12435

Ex. Ord. No. 12503, July 28, 1983, 48 F.R. 34723, as amended by Ex. Ord. No. 12507, March 22, 1985, 50 F.R. 11835, which related to the establishment, functions, administration and termination of the President's Commission on Organized Crime, was revoked by Ex. Ord. No. 12610, Sept. 30, 1987, 52 F.R. 36901.

Notes of Decisions (1966)

Footnotes

1       So in original.

18 U.S.C.A. § 1961, 18 USCA § 1961

Current through P.L. 113-36 approved 9-18-13

---

**End of Document**

© 2013 Thomson Reuters. No claim to original U.S. Government Works.